**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

LEYDA SANTALIBRADA CUELLAR,
            *Petitioner-Appellant,*

v.

RICHARD CECIL JOYCE,
            *Respondent-Appellee.*

No. 09-35068

D.C. No.
2:08-cv-00084-RFC

OPINION

Appeal from the United States District Court
for the District of Montana
Richard F. Cebull, Chief District Judge, Presiding

Argued and Submitted
November 4, 2009—Portland, Oregon

Submission Vacated November 5, 2009
Resubmitted and Filed February 19, 2010

Before: Alex Kozinski, Chief Judge, Raymond C. Fisher and
Richard A. Paez, Circuit Judges.

Opinion by Chief Judge Kozinski

## COUNSEL

Kevin M. Ashby and Robert R. Miller, Milbank, Tweed, Hadley & McCloy LLP, New York, New York; and Michael Anderson, Anderson & Liechty, P.C., Billings, Montana, for the petitioner-appellant.

Ronald F. Waterman and Sarah M. Power, Gough, Shanahan, Johnson & Waterman, PLLP, Helena Montana, for the respondent-appellee.

## OPINION

KOZINSKI, Chief Judge:

Petitioner seeks the return of her daughter to Panama under the Hague Convention on the Civil Aspects of International Child Abduction. The father opposes return; he claims that the mother is neglectful and very poor, that the child has grown used to living in America and that the child's medical needs cannot be addressed in Panama.

# I

Richard Joyce built a sailboat and sailed it to Panama, where he met Leyda Cuellar. He's a college professor; she was an exotic dancer. They married in Panama, where she eventually gave birth to a baby girl whom we call K.C. Leyda lives in Neuva Livia, a neighborhood that Richard describes as "slum-like," "beyond the end of the road" and "very dangerous," although Leyda points out that Richard never complained when they were dating.

When K.C. was nineteen months old, Richard arranged for Leyda and K.C. to meet him in Australia. At the Sydney airport, Richard separated himself and K.C. from Leyda and flew to the United States, leaving Leyda behind without her passport. Leyda tracked Richard down in Montana, where he currently lives with K.C., and petitioned the district court there for K.C.'s return. The district court denied relief and Leyda appeals.

# II

**[1]** The Hague Convention seeks to deter parents from abducting their children across national borders by limiting the main incentive for international abduction—the forum shopping of custody disputes. *See Mozes* v. *Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001). A court that receives a petition under the Hague Convention may not resolve the question of who, as between the parents, is best suited to have custody of the child. *See id.* With a few narrow exceptions, the court must return the abducted child to its country of habitual residence so that the courts of *that* country can determine custody.

**[2]** This policy of deterrence gives way to concern for the welfare of the child only in extreme cases. Article 13(b) of the treaty provides that return need not be ordered where "there is a grave risk that . . . return would expose the child to physi-

cal or psychological harm or otherwise place the child in an intolerable situation." So as not to impair the Convention's general policy, this exception is "narrowly drawn," *Asvesta* v. *Petroutsas*, 580 F.3d 1000, 1020 (9th Cir. 2009) (quoting *In re Adan*, 437 F.3d 381, 395 (3d Cir. 2006)), and all facts supporting the exception must be established by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). The exception "is not license for a court in the abducted-to country to speculate on where the child would be happiest." *Gaudin* v. *Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005) (quoting *Friedrich* v. *Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996)).

The district court found that "K.C. was a habitual resident of Panama and the removal or retention of K.C. did breach the rights of custody attributed to [Leyda]. Additionally, [Leyda] was exercising her custody rights at the time of the removal or retention." The district court also assumed (but did not find) that Leyda did not consent to removal. It nevertheless withheld relief under this grave risk exception. The court cited Leyda's living conditions in Panama, K.C.'s medical needs and K.C.'s psychological attachment to the United States and her father. We review the district court's factual findings for clear error, but determine de novo whether those facts establish a grave risk of harm. *See Mozes*, 239 F.3d at 1073; *Silverman* v. *Silverman*, 338 F.3d 886, 896 (8th Cir. 2003).

**[3] A. Living Conditions.** The district court credited Richard's testimony about the home where Leyda lived with K.C.: that the home "has no indoor running water"; that "residents in this area use a nearby creek and outhouse for waste disposal"; and that the home "has no climate control, no refrigeration, and very little furniture." Accepting all this as true, as the district court seems to have, it comes nowhere close to establishing a grave risk of harm if K.C. were returned to Panama to live with her mother. Billions of people live in circumstances similar to those described by Richard. If that amounted to a grave risk of harm, parents in more developed countries would have unchecked power to abduct children

from countries with a lower standard of living. At the time the Convention was adopted, the State Department took care to emphasize that grave risk doesn't "encompass . . . a home where money is in short supply, or where educational or other opportunities are more limited." 51 Fed. Reg. 10494, 10510 (1986); *see also Baxter* v. *Baxter*, 423 F.3d 363, 365-66, 373 (3d Cir. 2005).

**[4]** The district court acknowledged that poverty is not a reason to deny relief. However, it expressed additional "concerns about whether K.C. was properly nourished during the time she lived in Panama." The district court made no finding that K.C. was malnourished or that her diet in Panama had imperiled her health. Nor was there evidence that could have supported such a finding. Richard testified that K.C.'s "diet was poor, so she was kind of small and thin," and the district court noted that a professor of early childhood education called by Richard "did express concern that *perhaps* K.C. was malnourished." (emphasis added) This plainly does not amount to clear and convincing evidence of a grave risk of harm, and the district court erred by denying relief on that basis.

The district court also denied relief based on its conclusion that "K.C. suffered a serious head injury that was easily preventable" while in her mother's care. The district court appears to have credited Richard's testimony on this matter, which it recounted as follows:

> K.C. was playing in a wheeled walker on a concrete construction platform which had no guardrails and she fell seven feet off the ground to a concrete platform, landing on her head. K.C. was unconscious from the fall and was taken to a health care facility where an x-ray was taken.

The district court also relied on Richard's testimony that K.C. was sometimes cared for by a sick relative, had frequent ear

infections and had unexplained burns behind her earlobes. Based on this testimony, the district court concluded that Leyda was so neglectful that to return K.C. to her custody would be "unsafe."

**[5]** By drawing this conclusion about Leyda's fitness as a parent, the district court overstepped its mandate and impermissibly addressed the ultimate question of custody. Well-cared-for children do occasionally have accidents, and leaving a child with a sick relative may or may not be neglectful, depending on the circumstances. Richard's feeble showing—even if believed verbatim, as the district court seems to have done—falls far short of clear and convincing evidence of "serious abuse" that is "a great deal more than minimal." *Gaudin*, 415 F.3d at 1035 (citations and internal quotation marks omitted). Indeed, troubling as K.C.'s fall may be, she was subsequently given medical treatment, including an x-ray. It was not the district court's prerogative to determine whether Richard or Leyda was the better parent.

Richard tries to fashion an exception to this rule where the abducting parent believes the legal system in the country of habitual residence is too corrupt to fairly decide the issue of custody. Richard testified:

> I believe that if [K.C.] goes back to Panama, she'll be lost the moment she gets off the plane. Neuva Livia is outside the bounds of what we consider a civilization, and that will just be it. I can't show up down there in some local court in Neuva Livia as the gringo and argue anything. I don't believe I'll ever see her again.

It's unsurprising that Richard thinks he'll get a better shake in the courts of his home country; parents who abduct their children across international boundaries are generally driven by the same hope. But the animating idea behind the Hague Convention is to eliminate "any tactical advantages gained by

absconding with a child." *Holder* v. *Holder*, 392 F.3d 1009, 1013 (9th Cir. 2004). The time to take such considerations into account is before undertaking the volitional acts that lead to conception. Once the child is born, the remote parent must accept the country where the child is habitually resident and its legal system as given. Absent a showing of grave risk, or that one of the Convention's other narrowly-drawn exceptions applies, whatever case the remote parent may have for custody must be made there.

[6] At least one court has held that a petitioner may defeat removal by showing that courts "in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection" from a severely abusive or neglectful parent. *Friedrich*, 78 F.3d at 1069. This statement is in some tension with the theory of the Hague Convention and our holding that the grave risk inquiry focuses only on "the period necessary to obtain a custody determination." *Gaudin*, 415 F.3d at 1037. But we need not dwell on the question of whether to adopt the Sixth Circuit's rule as our own because the evidence presented by Richard comes nowhere close to raising the issue. Richard's speculative and unsubstantiated concern about the fairness of Panama's courts falls woefully short of the showing required by the Sixth Circuit in *Friedrich*.

[7] **B. Medical Concerns.** The district court concluded that K.C. exhibits "ataxia," which is a lack of coordination that may be symptomatic of a number of underlying neurological conditions. *See* Mayo Clinic, Ataxia, http:// www.mayoclinic.com/health/ataxia/DS00910 (last visited Feb. 16, 2010). The district court based this finding on Richard's testimony regarding a diagnosis by an unidentified physician, testimony by a professor of early childhood education whose primary area of study is "intergenerational patterns of intimacy and autonomy" and a written statement by Richard's sister (a registered nurse) prepared a full year after she examined K.C. The professor didn't claim to be qualified to give

a medical opinion, and Richard's self-serving testimony about actual medical doctors was vague and unsubstantiated. Even assuming the sister's report wasn't hearsay, its probative value was limited given the sister's likely bias, the lack of cross-examination, the time elapsed between the sister's observations and her report, and the fact that she's not a doctor. None of this amounted to clear and convincing evidence of a medical condition. The district court clearly erred in finding that it did.

[8] Even if the record did support a conclusion that K.C. exhibits ataxia, there's still no basis to conclude that returning her to Panama would pose a grave risk of harm. The evidence didn't show that K.C. was undergoing a regular course of treatment in the United States; Richard testified that he didn't even have an appointment for K.C. to see a doctor. Although Richard testified that Panama lacks the medical services that K.C. needs, nothing he said indicates that he is knowledgeable about the limits of the Panamanian health system. To the contrary, he admitted on cross-examination that he didn't know what care doctors in Panama could provide. The district court's finding that "Panama has doctors but they will not have the specialized treatment and therapy that K.C. needs" is unsupported by the record.

A parent may be able to defeat or delay return by showing that it would disrupt an ongoing course of medical treatment and severely impact the child's health. But the parent would have to provide clear and convincing evidence both of the child's serious medical needs and of the home country's inability to provide the necessary care. That evidence was entirely lacking here.

[9]  **C. Psychological Harm.** The district court also denied relief based on K.C.'s attachment to the United States and her father, and the psychological harm that would result if she were to return to Panama. This was a very serious error. The fact that a child has grown accustomed to her new home is

never a valid concern under the grave risk exception, as "it is the *abduction* that causes the pangs of subsequent return." *Friedrich*, 78 F.3d at 1068; *see also Asvesta*, 580 F.3d at 1020-21; *England* v. *England*, 234 F.3d 268, 271-72 (5th Cir. 2000). Rather than allowing an abducting parent to profit from the psychological dislocation that he has caused, the Convention attempts to avoid the harm by deterring parents from abducting their children in the first place.

* * *

There's nothing special about this case; it falls squarely within the heartland of the Hague Convention. Richard has provided absolutely no evidence that should have delayed K.C.'s return to her habitual residence in Panama. Indeed, the delay in this case can only have exacerbated the harm caused by K.C.'s abduction. The Hague Convention does not allow abducting parents to resort to courts in their home country in order to thwart return of the child to its habitual residence. District courts considering Hague Convention cases are cautioned not to allow abducting parents to manipulate judicial process for purpose of delay, as Richard obviously has here.

**[10]** We reverse the district court's determination that K.C. would suffer a grave risk of harm if returned to Panama. Richard's request for judicial notice is denied, as the materials contained therein are not relevant to the disposition of this appeal.

Although the parties presented evidence on the question of whether Leyda consented to K.C.'s removal to the United States, the district court assumed, without deciding, that Leyda did not consent. Because a finding of consent would defeat Leyda's petition, we would normally remand for a determination of that issue. In this case, however, a remand would be pointless. The only evidence of consent that Richard presented was the fact that Leyda allowed herself to be separated from Richard and K.C. at the airport in Sydney. This is

plainly insufficient. Being victim of a successful abduction can never prove consent. Even ambiguous statements or actions don't suffice; the Convention requires the parent opposing removal to "unequivocally demonstrate that [the petitioning parent] consented to the child's indefinite stay in [America]." *Asvesta*, 580 F.3d at 1019. There's no such evidence here; in fact, Leyda's email to Richard shortly after the abduction, imploring him to "give me back my baby" and stating that "I'm going to die if you don't return her," provides strong evidence to the contrary. A remand for findings as to consent would achieve only unnecessary delay, as the record would not support a finding that Leyda consented.

**[11]** We order Richard to transfer custody of K.C. to Leyda by 1:00 p.m. MST on the third business day following the issuance of this opinion. Within 10 days of receiving custody, Leyda shall return to Panama with K.C.; Leyda may request a limited extension upon a convincing showing of good cause. The district court shall provide Leyda with all of K.C.'s travel documents and take all steps necessary to ensure that Richard complies with this order, including, if necessary, ordering intervention of the United States Marshals Service.

**REVERSED.**

The mandate shall issue at once. Fed. R. App. P. 2.