WARNER, J.
The appellant father, a resident of St. Kitts, appeals the trial court’s denial of his petition for the return of his minor child, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, the terms of which have been codified in 42 U.S.C. § 11601 et seq. Where a child has been wrongfully removed from his home country, the court must order his return unless the party removing the child can show at least one of a few narrow exceptions. The trial court found that the child had become settled in his environment, within the meaning of the Convention, and that return of the child would constitute a grave risk to the child. We conclude that the trial court misapplied the Convention in finding that the child should not be returned because he is settled in his environment. Nevertheless, because our review is limited to whether competent substantial evidence supports the trial court’s order, we affirm as to the trial court’s conclusion that the mother proved return would put the child at grave risk of harm.

Background on ICAJtA and the Hague Convention

Congress enacted the International Child Abduction Remedies Act (ICARA) to implement the Hague Convention on the Civil Aspects of International Child Abduction, a treaty[1] to which both the United States and St. Kitts are signatories. See 42 U.S.C. §§ 11601-11611; The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25,1980, 19 I.L.M. 1501 (“Hague Convention” or “Convention”); Dep’t of State, Hague Abduction Convention Country List, available at http://travel.state.gov/ abduction/resources/congressreport/ congressreport_1487.html (last visited July 14, 2011) (listing St. Kitts as a signatory to the Hague Convention).
The Hague Convention “establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights.” 42 .U-S.C. § 11601(a)(4). The objects of the Convention are “to secure the prompt return of children wrongfully removed to or retained in any Contracting State” and “to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States.” Hague Convention, *936 art. 1. The Convention is intended to “restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.” Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th Cir.1996).
Article 3 of the Hague Convention provides that the removal of a child is wrongful where it is in breach of the rights of custody of another person, and those rights were actually being exercised or would have been exercised but for the removal. See Hague Convention, art. 3. A person may file a petition under the Convention for the return of a child “in any court ... which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.” 42 U.S.C. § 11603(b). A United States court deciding an abduction claim is empowered “to determine only rights under the Convention and not the merits of any underlying child custody claims.” 42 U.S.C. § 11601(b)(4); see also Hague Convention, art. 19 (“A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.”).
If a petitioner meets the burden of proving by a preponderance of the evidence that the removal was wrongful, any children who were wrongfully removed “are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.” 42 U.S.C. § 11601(a)(4); see also 42 U.S.C. § 11603(e)(1)(A) (setting forth preponderance of the evidence standard for proving that the child has been wrongfully removed). Thus, if the child is wrongfully removed, then the child must be returned to his or her state of habitual residence unless the respondent can establish an affirmative defense. See Furnes v. Reeves, 362 F.3d 702, 712 (11th Cir.2004). Among the available affirmative defenses, only two are relevant to this appeal: (1) the proceeding was commenced more than one year after the removal of the child and the child has become settled in his or her new environment; or (2) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. See Hague Convention, arts. 12, 13b. The settled environment defense requires proof by a preponderance of the evidence, while the “grave risk” defense requires proof by clear and convincing evidence. See In re Ahumada Cabrera, 323 F.Supp.2d 1303, 1310 n. 1 (S.D.Fla.2004); see also 42 U.S.C. § 11603(e)(2)(A), (B).

Facts of this Case

We preface our recitation of the facts of the case with the observation that in its final ruling, the trial court found, and it is not disputed in this appeal, the father had a right of custody to his son, and the mother wrongfully removed S.W. from his country of habitual residence, St. Kitts. Thus, the issues in this appeal concern whether the mother met her burden of establishing an exception to the immediate return provision of the Hague Convention. Only two witnesses testified and provided the evidence from which the trial court made its decision: the father and the mother. No other evidence relevant to the issues on this appeal was produced.
The father, Shawn Wigley, is a resident of St. Kitts, an island in the Caribbean. He has resided there for most of his life. On April 2, 1999, the father married the mother, Pattyanna Hares, in St. Kitts. When they married, the father was 29 or 30 years old, and the mother was 19 years old. The mother is a citizen of Guyana. The parties have one minor child together, S.W., a son born on December 13, 1999. The mother testified that during her pregnancy, the father hit her severely. However, when she called the police, they re *937 fused to interfere, saying it was a civil matter. The father denies ever hitting or threatening the mother or in any way threatening the child.
The parties separated in 2000. According to the mother, the father beat her and locked her out of the house with the baby, S.W., in her arms, when she caught him cheating on her. The mother later returned to the father’s house to ask him for support for the child. Instead, the father called Child Welfare in St. Kitts, and they removed the child from the mother and placed him with the father for ten days. After that, the father agreed to allow the mother to take the child to Guyana where the child’s maternal grandparents lived. According to the mother, he told her never to return. Nevertheless, she did return and brought the child to see the father, who kept the child for two years, according to the mother’s testimony, when she was not allowed to see him. Nevertheless, according to the father and his affidavit of habitual residence, during the time period from 2000 to 2006, S.W. frequently alternated between living with the father and living with the mother and in Guyana with the mother’s parents. The mother also had another child, not by the father, while separated but not divorced from the father.
Sometime in 2003 when the child was in St. Kitts, St. Kitts Child Welfare removed the child from the mother’s custody and placed him with the father, as the mother did not have a place to live. In September 2003, at a time when the child was living with the father, the mother alleged that the father sexually abused S.W. She based this allegation in large part on her belief that she smelled a scent similar to a latex condom when the father brought the child to her house. The authorities in St. Kitts conducted an investigation of the allegation, which included interviews of the parents and a medical examination of the child, but concluded that no sexual abuse had occurred. Accordingly, the child was returned to the father’s custody. In the mother’s testimony, the mother stated that she was relieved when the doctor told her that nothing was wrong with the child. Nonetheless, the mother had “suspicions” about the father and thought he was capable of sexually abusing the child, but admitted that she had nothing to back up this opinion.
Following the investigation of the alleged sexual abuse, the mother was “not pleased with what the Child Welfare had done.” She went to S.W.’s preschool, forcibly removed him, and fled to Guyana with him. The father testified that he did not have any idea that the child was being removed, and the mother did not call him to tell him until after she was gone. Initially, the mother gave a similar account, testifying that she took the child to Guyana without telling the father and that the father did not find out until she called him from Guyana. At another point in her testimony, however, the mother testified that the father went after her with a gun the day she took the child from the school, and she was forced to hide until he went away and she could leave for Guyana. In its final order, the trial court appears to have accepted this second version of the mother’s testimony.
According to the father, the child then lived in Guyana for about two years. The mother returned to St. Kitts for approximately one year, but left the child in Guyana with the mother’s parents. The father claimed that he sent maintenance money to the mother’s family in Guyana. He also testified that he bought a plane ticket to Guyana to visit the child, but the night before the flight was to depart, S.W.’s grandfather told him that his son was in *938 St. Kitts. The parties’ son returned to St. Kitts on or about June 1, 2005.
The father had been in the St. Kitts military for several years.[2] The military base was close to his son’s school, so the father would bring the son his lunch every day. The father testified that he gave the mother money every month, and also paid for his son’s schooling, uniforms, textbooks, and his son’s medical expenses. By contrast, the mother testified that the father paid child support for only four months (from November 2000 to February 2001). Other than those four months, the mother denied that the father had ever paid money for the child, though she admitted that the father paid for most of the school tuition fees.
In June 2006, the parties were divorced in St. Kitts. The parties’ divorce decree did not address the custody of the parties’ minor child. The parties had, however, worked out a timesharing agreement whereby the mother would have the child on weekdays and the father would have the child on weekends. The mother testified that after the divorce the St. Kitts government informed her that since she was no longer married to a St. Kitts citizen, she could not secure a work permit and would have to leave. She told the father of this fact.
In September 2006, the father testified that the mother prevented him from seeing his son. The father had gone to the mother’s home to pick up his son for the weekend, but the mother told the father that S.W. “was not coming.” When the father asked her why, the mother stated that she suspected that he was having sex with S.W. In October 2006, the father filed a complaint and summons in St. Kitts because the mother was denying him access to his son. A hearing on the father’s complaint was set for October 26, 2006. The mother knew about the hearing. The father had spoken to the mother, who told him that she received a summons to appear before the court. However, three days before the hearing, the mother removed S.W. from St. Kitts. The last time the father saw his son was in October 2006.
Contradicting the father’s testimony, the mother testified that she had to leave St. Kitts to protect her son and that she traveled to the United States for the purpose of never allowing the father to see S.W. again. During the first week of October in 2006, according to the mother, the father came to her house one night in his boxer briefs telling her that God had instructed him to issue the punishment of Pharaoh, taking the life of her first born child (which was S.W.), as punishment for her sin of adultery. The mother claimed that the father threatened to pay to have S.W. killed and have it appear that the mother killed S.W. The father had been saying “crazy things” and that the best thing to do was to get the child away from him and into a safe environment as soon as possible. She stopped allowing the father to see S.W. after the father threatened to kill him.
The mother knew about the father’s application to the courts in St. Kitts regarding the custody of their son but did not attend the 2006 court hearing in St. Kitts because she did not think she “stood a chance there.” The mother decided on her own that she didn’t like the remedies that might be available in St. Kitts, so it was a better idea to just leave. She admitted that she did not call the police or the *939 Department of Child Welfare regarding the incident where the father threatened the life of the child. In the past the police had deemed acts of domestic violence against her as a “civil” matter which they could not handle. She refused to deal with Child Welfare because they had taken away S.W. from her in the past because she did not have a job. Therefore, on October 23, 2006, she fled with her children to Florida.
The St. Kitts authorities did not conduct a hearing on the father’s petition, because the mother was not present. In January 2007 the father commenced looking for his son. The authorities were not helpful but through his own investigations he finally learned that the mother had left for Florida, and he discovered the name of a person with whom the mother and child may be staying. The father then hired an investigator in Florida to pursue these leads. The investigator provided the location of the child to him on April 9, 2009. He passed this on to the governmental authorities who did nothing. Because he could not afford an attorney, he could not get immediate action. He did not file a petition for return of the child until April 19, 2010, over a year from the time that he located his son.
The mother had fled with the child to the United States because she perceived that in the United States legal system she and the child would be protected. She left St. Kitts on October 23, 2006, and arrived in Florida. That same day she moved to Port St. Lucie into the home of her best friend’s brother, Mr. Watkins. The first time she met Watkins was at the airport in October 2006, and she moved into his house even though she knew very little about him. Watkins works as a tennis coach and delivers newspapers. The mother acknowledged that Watkins had spent several years in jail in St. Martin for drug-related crimes and that she was aware of a murder accusation against him in St. Kitts. Just a few days prior to the hearing in this case, she married Mr. Watkins after having lived in his home for four years. She testified that Mr. Watkins is an American citizen.
They have lived in the same house in Port St. Lucie since October 2006. S.W. is bonded to his siblings. S.W., who is now ten years old and in the fourth grade, has been home-schooled since' his arrival in Florida. The mother obtained online materials to school S.W., but she has not registered S.W. with :the St. Lucie County school system. The mother acknowledged that S.W. is supposed to take an annual placement test as a homeschooled student, but the child has never taken any placement tests and has never taken the FCAT. No one from the school district has checked on the child’s progress. The mother would actually prefer to place the child in public school, but she did not do so because she was afraid the father would find him. She was home-schooling S.W. specifically to hide him from the father.
The family lives in a gated community which makes access of the public very difficult. While S.W. plays tennis with Mr. Watkins, he plays no other organized sports, nor is he involved in any other community activities. He does not attend any church. S.W. plays with children in the neighborhood but only under the watchful eye of his mother or her husband. Even when he plays with his best friend, who was not named, the mother is always there with him.
Both the mother and S.W. are illegal aliens, although the mother’s recent marriage to Mr. Watkins may make her eligible to obtain legal status. She testified that she had considered marriage earlier but she was afraid that the public documentation of any marriage would alert the *940 father to her whereabouts, and he could then harm their son. For the same reason, she has never held a job in Florida.
While she has relatives in Florida, she does not see them frequently, and the child has only seen his cousins one time since his arrival four years ago. S.W. has developed a relationship with Mr. Watkins’ relatives in Florida, but all of them know of the mother’s concerted efforts to hide both herself and their son from his father. The mother acknowledged that S.W. does not spend any time away from the house with anyone who is not a family member, at least not without the mother or her immediate family being present. The step-father’s family is aware that S.W. “just couldn’t come around” to family functions around town because she was afraid the father would find her and might do something, such as “shooting up everything and then shooting me.”
The mother testified that she feared S.W.’s return to St. Kitts because of the father’s threat to kill her first born child in October of 2006. She thinks her child would be psychologically harmed because he is settled in his present lifestyle. The mother thought that the father was mentally unstable, because he had told her that the Army had demoted him for his “craziness.”
At the end of the hearing, the court allowed the mother to tell the court that the child was upset at the prospect of going back to St. Kitts. The mother had told the child of the possibility, and the child cried.
In its written order the trial court found that the father established that the mother had wrongfully removed S.W. from St. Kitts. However, because the father filed his petition for return one year and ten days after he discovered the child’s whereabouts, the court could consider the defense that the child was settled in his environment. The court specifically found that the mother’s testimony was more credible than the father’s. The court found as follows: “[Cjompetent substantial evidence that the child is now settled in his new environment came from the mother’s testimony, which the court finds credible.” The court further found that “[tjhe preponderance of evidence showed that the child is bonded with family and friends, that he is properly home-schooled, and that removing him from his current environment would cause him psychological harm.” Finally, the trial court found that the mother had established a grave risk if the child were returned to St. Kitts. The court noted that although the father denied the mother’s allegations of violence and threats to the child, he “did not adequately rebut the mother’s testimony.” Based on the mother’s testimony, the trial court found that she had demonstrated by clear and convincing evidence that the mother absconded from St. Kitts and hid the child from the father because she believed the father was violent and had threatened S.W. Accordingly, the trial court denied the father’s petition for S.W.’s return, prompting this appeal.

Standard of Review

Under federal decisions, “for all issues arising under the Convention, a District Court’s determination of facts is reviewed for clear error and its application of those facts to the law, as well as its interpretation of the Convention, are reviewed de novo.” In re Application of Adan, 437 F.3d 381, 390 (3d Cir.2006); see also Blondin v. Dubois, 238 F.3d 153, 158 (2d Cir.2001) (“Blondin II”); Shalit v. Coppe, 182 F.3d 1124, 1127 (9th Cir.1999); Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th Cir.1996). We apply that standard to this case.

*941
Settled Environment

Because the father filed his petition for the return of the child a year and ten days after he located the child, the mother could assert the claim that the child is settled in the new environment as a defense to removal based on Article 12 of the Convention.
The rationale behind Article 12’s “now settled” defense is that when (“a child has become settled and adjusted in [his new environment, a] forced return might only serve to cause him or her further distress and accentuate the harm caused by the wrongful relocation.”). Beaumont & McEleavy, The Hague Convention on International Child Abduction 203 (1999); see also Perez-Vera Report ¶ 107 (explaining that “it is clear that after a child has become settled in its new environment, its return should take place only after an examination of the merits of the custody rights exercised over it....”).
In re B. Del C.S.B., 559 F.3d 999, 1003 (9th Cir.2008). The court looks to the U.S. State Department for interpretation of what “settled” means:
The Convention does not provide a definition of the term “settled.” However, the U.S. State Department has declared that “nothing less than substantial evidence of the child’s significant connections to the new country is intended to suffice to meet the respondent’s burden of proof.” Public Notice 957, Text & Legal Analysis of Hague International Child Abduction Convention, 51 Fed. Reg. 10494, 10509 (U.S. State Dep’t Mar. 26,1986).

Id.

The Ninth Circuit has provided a list of factors to consider when making the “settled environment”, analysis. These include:
(1) the child’s age; (2) the stability and duration of the child’s residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child’s participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent’s employment and financial stability. In some circumstances, we will also consider the immigration status of the child and the respondent. In general, this consideration will be relevant only if there is an immediate, concrete threat of deportation. Although all of these factors, when applicable, may be considered in the “settled” analysis, ordinarily the most important is the length and stability of the child’s residence in the new environment.
Id. at 1009 (footnote omitted); see also In re Ahumada Cabrera, 323 F.Supp.2d at 1314. Despite the court’s emphasis on length of stay, in the same U.S. State Department’s analysis of the Hague Convention that the court quotes earlier, the text states:
The reason for the passage of time, which may have made it possible for the child to form ties to the new country, is also relevant to the ultimate disposition of the return petition. If the alleged wrongdoer concealed the child’s whereabouts from the custodian necessitating a long search for the child and thereby delayed the commencement of a return proceeding by the applicant, it is highly questionable whether the respondent should be permitted to benefit from such conduct absent strong countervailing considerations.
51 Fed. Reg. 10494, 10509.
In addition, some courts have taken the position that the immigration status is *942 a factor in the “settled environment” analysis, even if immediate deportation is not at hand. See In re Koc, 181 F.Supp.2d 136, 154 (E.D.N.Y.2001); see also Lopez v. Alcala, 547 F.Supp.2d 1255, 1260 (M.D.Fla.2008) (finding that the children’s “residence in this country is not stable because neither [the abducting parent] nor the children have legal alien status and, as such, are subject to deportation at anytime”). Moreover, a court may consider the active measures undertaken to conceal the child’s whereabouts, as well as the prospect that the abducting parent could be prosecuted for violations of law based on the concealment. Lops v. Lops, 140 F.3d 927, 946 (11th Cir.1998). Finally, at least one court has required that the abducting parent provide evidence that the child had developed the connections to the community which a normal child of his or her age would. See In re Petition for Writ of Habeas Corpus for Coffield, 96 Ohio App.3d 52, 644 N.E.2d 662, 664 (1994) (affirming trial court’s decision to return child to Australia, even though the child had been in the United States for three years, where the child had been in his most recent residence for only ten months and “appellant did not show that [the child] had developed the connections to the community which a normal child of his age would, ie., appellant did not show that [the child] had developed relationships with other individuals besides those which appellant specifically chose. Under these circumstances, appellant failed to carry his-burden of proof.”).
In applying the foregoing factors and analysis to this case, we come to the conclusion that the evidence provided by the mother and found by the trial court is insufficient as a matter of law to prove that the child is settled in his environment within the meaning of the Hague Convention. While the child, age ten, has lived in the same house for the four years he was in Florida at the time of the proceeding, he has never attended school or been monitored by the school system. On that issue, the trial court’s finding that he was “properly” home-schooled is clearly erroneous. The mother purposely kept him out of all community activities, sports, and even church to avoid detection by the father. He is allowed to have friends only when his mother or her present husband are around. Even his contact with family is very limited. Although he is around his mother’s husband’s family to some extent, the mother testified that the family knows that the child cannot always be around for fear of the father discovering the child. The mother has no employment outside the home, and she is an illegal alien, although a few days prior to the hearing she married and may be able to achieve legal status.
The child has not made any of the connections that a child would normally develop in the community, all because the mother has purposely concealed the child. To approve this conduct by finding that the length of time in this concealed existence results in the child being “settled” in his environment would undermine the very purpose of the Convention. “[A] court’s interpretation of a treaty will have consequences not only for the family immediately involved but also for the way in which other courts — both here and abroad — interpret the treaty.” Walsh v. Walsh, 221 F.3d 204, 221-22 (1st Cir.2000). We conclude that based upon the evidence as found by the trial court, the child has not become “settled” in his environment as contemplated by the ICARA. This is in keeping with the U.S. State Department’s interpretation of the Convention. “A removing parent must not be allowed to abduct a child and then — when brought to court — complain that the child has grown used to the surroundings to which they *943 were abducted.” Friedrich, 78 F.3d at 1068. The trial court erred in finding that this exception supported denial of the petition to return.

Grave Risk of Harm

As previously noted, the general policy of the Hague Convention is that with a few narrow exceptions, “the court must return the abducted child to its country of habitual residence so that the courts of that country can determine custody.” Cuellar v. Joyce, 596 F.3d 505, 508 (9th Cir.2010) (emphasis in original). “This policy of deterrence gives way to concern for the welfare of the child only in extreme cases.” Id. Article 13(b) of the treaty provides an exception to the policy of returning the child in cases where “there is a grave risk that ... return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.” This exception is to be “narrowly drawn.” Asvesta v. Petroutsas, 580 F.3d 1000, 1020 (9th Cir.2009). The U.S. State Department’s analysis of the Convention explains the level of harm necessary to meet this exception:
This provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child’s best interests. Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court’s determination. The person opposing the child’s return must show that the risk to the child is grave, not merely serious.
A review of deliberations on the Convention reveals that “intolerable situation” was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An exam-pie of an “intolerable situation” is one in which a custodial parent sexually abuses the child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child’s return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an “intolerable situation” and subjected to a grave risk of psychological harm.
Public Notice 957, 51 FR 10494, 10510 (March 26, 1986) (emphasis added). Courts have held that psychological evidence that the child will be harmed by a change of residence is not the type of grave harm necessary to prevent removal. See Friedrich, 78 F.3d at 1067; Nunez-Escudero, 58 F.3d at 378.
In dicta in Friedrich, the Sixth Circuit narrowed the conditions upon which a “grave risk” defense can be mounted. The court said:
First, there is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of the custody dispute — e.g., returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.
Friedrich, 78 F.3d at 1069 (emphasis in original). This view has been articulated by other courts. See, e.g., Blondín v. Dubois, 238 F.3d 153 (2d Cir.2001). The Friedrich court explained that it could not assume that the country of habitual residence would not also be able to protect its children:
In thinking about these problems, we acknowledge that courts in the abduct *944 ed-from country are as ready and able as we are to protect children. If return to a country, or to the custody of a parent in that country, is dangerous, we can expect that country’s courts to respond accordingly.
Friedrich, 78 F.3d at 1068.
Other courts, however, have rejected this dicta. In Van De Sande v. Van De Sande, 431 F.3d 567, 571 (7th Cir.2005), Judge Posner rejected the Sixth Circuit’s approach, stating:
To give a father custody of children who are at great risk of harm from him, on the ground that they will be protected by the police of the father’s country, would be to act on an unrealistic premise. The rendering court must satisfy itself that the children will in fact, and not just in legal theory, be protected if returned to their abuser’s custody.
Moreover, to define the issue not as whether there is a grave risk of harm, but as whether the lawful custodian’s country has good laws or even as whether it both has and zealously enforces such laws, disregards the language of the Convention and its implementing statute; for they say nothing about the laws in the petitioning parent’s country. The omission to mention them does not seem to have been an aecident-the kind of slip in draftsmanship that courts sometimes correct in the exercise of their interpretive authority.[3]
The Eleventh Circuit has also rejected the approach of Friedrich in Baran v. Beaty, 526 F.3d 1340, 1348 (11th Cir.2008):
To require a respondent to adduce evidence regarding the condition of the legal and social service systems in a country she has fled creates difficult problems of proof, and appears not to have been contemplated by the Convention. Although we are cognizant of the Convention’s goal of quickly returning abducted children to their countries of habitual residence, the text of the Convention and the commentaries on it place a higher premium on children’s safety than on their return. Consequently, we decline to impose on a responding parent a duty to prove that her child’s country of habitual residence is unable or unwilling to ameliorate the grave risk of harm which would otherwise accompany the child’s return.
(footnote omitted). We adopt the approach of the Seventh and Eleventh Circuits and conclude that the Convention does not place a burden on the mother to prove that St. Kitts would not, or could not, protect her child.
Addressing the facts of this case, the trial court found the mother’s testimony to be more credible than the father’s because of her demeanor and the greater detail she provided, whereas the father’s testimony lacked clarity. The court noted that the father denied but did not “adequately rebut” the mother’s testimony that he is violent and a threat to the child. The evidence presented by the mother showed that she was a victim of domestic violence from before the child was born. She testified that the father beat her during her pregnancy including hitting her in the stomach. Then after the child was born, he hit the mother with the child in her arms. When she caught him cheating, *945 they had a fight where he locked the mother and child out of the house with the child having nothing but a shirt on. The court recited her testimony regarding the incident in 2003 where she suspected that the father, or someone with whom the father had left the child, had sexually abused the child. The court also found as a fact that when she fled to Guyana, the father brandished a gun and threatened her, and she had to run with the child to hide. The court found as a fact that the father had threatened to kill the child as punishment to the mother in 2006 after which the mother fled to Florida.
With respect to the grave risk of harm defense, the court made the following conclusion:
The mother’s testimony was credible and showed by clear and convincing evidence that she left St. Kitts with the child and continuously concealed the child’s whereabouts because she feared that the father would harm the child, and to protect the child from a man whom she knew to be violent and who had threatened to take the child’s life. In addition to proof that the child is settled in his new environment, the mother has proved by clear and convincing evidence the existence of a grave risk that the child’s return to St. Kitts would expose the child to physical or psychological harm, or otherwise place the child in an intolerable situation.
Although the burden of proof of clear and convincing is a greater burden than preponderance of evidence, the standard of review of such finding appears to be the same. That is, the appellate court reviews the factual findings for clear error and the application of the facts to the Convention and its interpretation rife novo. See In re Application of Adan, 437 F.3d at 390 (standard is the same for clear and convincing findings as for all other issues under the act). The “clearly erroneous” standard does not permit the appellate court to reweigh the factual evidence.
If the district court’s account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be clearly erroneous.
Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).
With respect to the factual findings of the trial court, the court’s finding that return to St. Kitts would cause the child psychological harm was not proved by the testimony. The court heard only that the child would be upset by a return. That type of psychological harm is not the grave harm contemplated in the act. “The harm must be ‘something greater than would normally be expected on taking a child away from one parent and passing him to another’; otherwise, the goals of the Convention could be easily circumvented.” Walsh, 221 F.3d at 218. Even if the court believed the testimony of the mother that the child would be psychologically harmed — something to which she was not competent to testify — the type of harm she described was no more than the normal harm caused by the removal of a child from one parent. This would be insufficient to meet the grave harm test of the Convention.
The claims of physical violence, however, are supported by the mother’s testimony. According to the mother, the father is a violent man who beat her while pregnant, again while holding their child, threatened both of them with a gun in 2003, and threatened to kill the child in 2006. While *946 the mother’s testimony was sometimes contradictory, the court still considered it more credible than the father’s testimony. Moreover, while it seems somewhat incongruous that the mother would be so fearful of the father, yet time and again leave the child in the care of the father, on appellate review, it is not our function to reweigh the evidence. As the Supreme Court noted, where there are two permissible versions, one which the fact finder accepted and one which it rejected, this cannot constitute clear error. Anderson, 470 U.S. at 574, 105 S.Ct. 1504.
Under Florida precedent, in Hernandez v. State, 16 So.3d 336, 340 (Fla. 4th DCA 2009), we adopted the following formulation for appellate review of a clear and convincing finding: “On appeal, a finding of clear and convincing evidence is presumed to be correct and will not be overturned unless it lacks evidentiary support or is clearly erroneous.... We review trial court’s finding of clear and convincing evidence for competent, substantial evidence.” T.S. ex rel. D.H. v. Dep’t of Children and Families, 969 So.2d 494, 495 (Fla. 1st DCA 2007). Competent, substantial evidence has been defined as:
[S]uch evidence as will establish a substantial basis of fact from which the fact at issue can be reasonably inferred.... [T]he evidence relied upon to sustain the ultimate finding should be sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached. To this extent the ‘substantial’ evidence should also be ‘competent.’
De Groot v. Sheffield, 95 So.2d 912, 916 (Fla.1957). Moreover, the mere fact that the testimonial evidence is not corroborated by other evidence does not preclude a finding that it is clear and convincing. See, e.g., I.D. v. Dep’t of Children and Families, 13 So.3d 1117, 1120 (Fla. 3d DCA 2009).
Based upon our limited role in reviewing the findings of fact, we conclude that the mother’s testimony provided competent substantial evidence to support the trial court’s finding that clear and convincing evidence proved that the child faced a grave risk of physical harm by return to St. Kitts, due to the father’s violence against the mother in the presence of the child and his threat of harm to the child. These findings are not unlike those which were sufficient to find grave harm in Bar-an. See Baran, 526 F.3d at 1345-48 (violence against the mother while pregnant, while the child was being held in her arms, and while the father was intoxicated sufficient to show grave harm).
Were we the finders of fact we might not have found the evidence provided by the mother clear and convincing of a grave risk of harm to the child within the meaning of the act. That is not our role, however. The trial court believed the mother’s testimony that the father had made threats to kill the child. That would in and of itself constitute a grave risk of harm, as even the Convention commentators would agree. On a cold record, we cannot second guess the trial court.
For these reasons, although we find that the trial court erred in finding that a defense to return existed, based upon the child having settled in his environment, we affirm the trial court’s denial of the petition for return based upon the proved defense that return would place the child at risk of grave harm.
HAZOURI, J„ and MONACO, TOBY S, Associate Judge, concur.

. In interpreting a treaty, the opinions of other signatories are entitled to considerable weight. Air France v. Saks, 470 U.S. 392, 403, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985); Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir.1995). "[TJreaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.” Choctaw Nation of Indians v. United States, 318 U.S. 423, 431-32, 63 S.Ct. 672, 87 L.Ed. 877 (1943).

. The father testified that he left the military in 2009 and was honorably discharged. He now runs a private security company.

. Judge Posner suggests that where a grave risk is present, return still could be ordered to the country of habitual residence depending upon "undertaking” conditions, such as keeping the child out of the custody of the abusive parent until a custody determination in the residence country is made. The father in this proceeding has not argued for any "undertakings” or presented any evidence or proposal to secure the safety of the child. Therefore, we do not address the issue.