FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANDREW CHARLES NISBET,

*Petitioner - Appellant*,

v.

SPIRIT ROSE BRIDGER,

*Respondent - Appellee*.

No. 23-3877

D.C. No.
3:23-cv-00850-IM

OPINION

Appeal from the United States District Court
for the District of Oregon
Karin J. Immergut, District Judge, Presiding

Argued and Submitted September 10, 2024
San Francisco, California

Filed December 20, 2024

Before: Jay S. Bybee, Carlos T. Bea, and Salvador
Mendoza, Jr., Circuit Judges.

Opinion by Judge Bea;
Dissent by Judge Bybee

# SUMMARY[*]

## Hague Convention

The panel affirmed the district court's order, after a bench trial, denying Andrew Nisbet's petition for the return to Scotland of his two young children under the Hague Convention on the Civil Aspects of International Child Abduction.

The panel held that the district court did not clearly err in finding that, under the totality of the circumstances, Nisbet failed to prove by a preponderance of the evidence that the children were habitual residents of Scotland when they left with their mother, Spirit Bridger, for the United States. Accordingly, under the standard set forth in *Monasky v. Taglieri*, 589 U.S. 68 (2020), Bridger did not wrongfully remove the children from their habitual residence under the Hague Convention. The panel held that the district court properly considered evidence that the children lacked a meaningful relationship with Nisbet, as well as the credible testimony of Bridger, the sole caregiving parent, that she never intended for Scotland to be more than a temporary location for herself and her children and that she lacked ties to Scotland. The panel held that the district court did not clearly err in finding that the children lacked any habitual residence. In addition, the children's mere physical presence in Scotland was not dispositive.

Dissenting, Judge Bybee wrote that the relevant facts quickly and easily showed that the children habitually

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

resided in Scotland. These relevant facts included evidence that Bridger had lived in Scotland for seven years, her children were British citizens and had lived in Scotland for all or most of their lives, Scotland was their father's home and they lived in an apartment he owned and paid for, the children attended nursery school in Scotland and received medical and dental care there, and, only a year before she left Scotland, Bridger applied for her third long-term visa.

**COUNSEL**

Rahgan N. Jensen (argued), Perkins Coie LLP, Phoenix, Arizona; Julia E. Markley, Perkins Coie LLP, Portland, Oregon; Jeremy D. Morley, The Law Office of Jeremy D. Morley, New York, New York; for Petitioner-Appellant.

Katrina A. Seipel (argued) and Katelyn D. Skinner, Buckley Law PC, Lake Oswego, Oregon, for Respondent-Appellee.

# OPINION

BEA, Circuit Judge:

Andrew Nisbet—who stabbed his mother in the throat killing her, pleaded guilty to manslaughter based on diminished responsibility, and was sentenced to indefinite psychiatric confinement in England—appeals the district court's order that denied his petition under the Hague Convention for return to Scotland of his two young children,[1] ACN (born in February 2018) and KRN (born in February 2020).[2] ACN and KRN were brought to the United States from Scotland by their mother, Spirit Bridger, in June 2022. The district court found Nisbet failed to prove by a preponderance of the evidence that ACN and KRN were habitual residents of Scotland when they left with Bridger for the United States. Bridger thus did not wrongfully remove them from their habitual residence under the Hague Convention. We affirm.[3]

---

[1] The Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), implemented in the United States by the International Child Abduction Remedies Act. 22 U.S.C. § 9001 *et seq.* Both the United States and the United Kingdom are signatories of the Hague Convention.

[2] ACN and KRN, both U.S. citizens, now live and attend schools in Oregon. They have social security numbers, health insurance, a pediatrician, and a dentist in the United States. Bridger is supported by her mother, stepfather, two brothers, and friends.

[3] We have jurisdiction under 28 U.S.C. § 1291.

I.

A.

Nisbet and Bridger met in 2012 in New York City when they were both on vacation.[4]  Nisbet, a British citizen, lived and worked in Scotland as a radiologist.  Bridger, a United States citizen, lived in Oregon and was unemployed.[5]

Despite Bridger's desire to stay in the United States, she moved to Scotland in 2012 to be with Nisbet because he purportedly could not work in the United States as a radiologist.  They lived in an apartment in Edinburgh that Nisbet owned and viewed only as temporary ("Edinburgh Residence").[6]  Nisbet's long-term plan had always been to raise his family in his parents' house on the Island of Jersey ("Jersey Residence"), a British Crown Dependency.  And throughout the relevant period, Bridger had and has always maintained a residence in Oregon.

Bridger wished to marry Nisbet, but they never did.  In Spring 2017, Bridger became pregnant with ACN in Scotland.  Adamant about the Jersey Residence, Nisbet asked to live with his parents.  Bridger in the meantime was thinking about returning to the United States.  Nisbet told Bridger she would return to the United States if his parents turned them down.

---

[4] Nisbet's counsel conceded at oral argument that the district court did not clearly err in finding Bridger a credible witness.

[5] While Bridger lived with Nisbet, she did not have any source of income other than from Nisbet, and she needed approval from Nisbet for most of her purchases.

[6] They traveled to New Zealand for one year after 2012 and returned to the Edinburgh Residence in 2015.

And turn them down his parents did, albeit after extensive arguments between Nisbet and his parents. Shortly thereafter, Nisbet attempted suicide by injecting air into his veins, but he survived. Uninvited, Nisbet then took Bridger to Jersey, and they showed up on the doorstep of the Jersey Residence. Nisbet's parents relented and allowed them to stay at an annex of the Jersey Residence on a temporary basis while Bridger was pregnant with ACN.

In January 2018, Nisbet again attempted suicide, this time by throwing himself out of a twenty-foot-high window onto a concrete patio, fracturing his feet and spine. Consequently, he was bedridden for at least seven months.

In February 2018, one month after Nisbet's second suicide attempt, ACN was born in Jersey. Bridger took care of both ACN and Nisbet for six months in Jersey, with minimal assistance from Nisbet's parents. In August 2018, once Nisbet could manage his own needs, Bridger moved from Jersey to Scotland with ACN. Nisbet still lived in Jersey but commuted back and forth between Jersey and Edinburgh. During this period, Bridger prepared to leave for the United States, but Nisbet convinced her to stay for a few more months so that he could try to resolve his family strife.[7]

In February 2019, Bridger returned to Jersey with ACN after Nisbet assured her that he had reconciled with his parents. Despite this assurance, however, Nisbet's relationship with his parents deteriorated. Nisbet would

---

[7] In November 2018, Bridger was granted a partnership visa, permitting her to remain in the United Kingdom for 30 months. She would potentially be eligible to apply for a permanent settlement status after completing five years on that partnership visa. Before obtaining this partnership visa, Bridger was in the United Kingdom on an entrepreneurship visa.

bang his head against the wall every day, sometimes several times a day.  He punched walls and broke a table.  The police were called when Nisbet once cornered his father and pulled his mother's hair.  Scared, Bridger told Nisbet she no longer loved him and wanted to return to the United States.

In early August 2019, Nisbet's parents served a notice of eviction on Nisbet and Bridger.  On August 6, 2019, Nisbet killed his mother by stabbing her in the neck with a pocketknife.   He was arrested and pleaded guilty to manslaughter on the grounds of diminished responsibility owing to mental disorder.   The Royal Court of Jersey sentenced Nisbet to indefinite psychiatric confinement at Brockfield House in Essex, England.   The district court found that Nisbet's family had since severed contact with Nisbet, Bridger, and ACN.[8]

Around the same time, by August 2019, Bridger had become pregnant with KRN.  After Nisbet was arrested, Bridger and ACN were taken to a refuge and then to a halfway house in Jersey.  Bridger planned to return to the United States once she was no longer needed for the police's investigation of Nisbet.   As KRN's due date neared, however, Bridger instead moved to the Edinburgh Residence in late 2019 to give birth to KRN because she did not have health insurance in the United States, she had no other place in the United Kingdom to live with her children, and she believed she needed to remain in the country while Nisbet's criminal case was pending.  That said, Bridger still planned to leave for the United States shortly thereafter, if she were released by the police authorities.

---

[8] Bridger reached out to Nisbet's family for help once, but they asked her not to contact them again.

KRN was born in February 2020.[9]  Then, the COVID-19 pandemic hit; country borders and airlines were closed.

From then until June 2022, and during the COVID-19 restrictions period, Bridger lived in the Edinburgh Residence with ACN and KRN.  Bridger kept in contact with Nisbet because she needed Nisbet's signature to apply for KRN's U.S. passport, she needed financial support from Nisbet, and her U.K. visa was expiring.[10]  Bridger told Nisbet multiple times she needed to return to the United States and reunite with her family.

While in Edinburgh, ACN and KRN attended a nursery school, and they received regular medical and dental care. Bridger testified that ACN and KRN "didn't actually make friends when they were in Scotland at nursery."  They made acquaintances elsewhere, "but they never knew anyone on a name basis."

ACN and KRN visited Nisbet several times at St. Andrew's Hospital in Northampton, England, where Nisbet has been in custody since April 2021.[11]  Nisbet scheduled

---

[9] Bridger's mother and her stepfather traveled from the United States to Scotland and visited her about a week before KRN's birth and stayed for about two weeks thereafter.

[10] In early 2021, Bridger applied for a permanent settlement status in the United Kingdom, believing she needed to stay in the United Kingdom for additional time so that she could obtain the necessary documentation from Nisbet for KRN's U.S. passport.  She was advised by the British Home Office that she was not yet eligible for a permanent settlement status, so Bridger instead applied for further leave to remain in the United Kingdom on her partnership visa.

[11] Nisbet was initially confined at Brockfield House in Essex, England, but he was transferred to St. Andrew's Hospital in Northampton, England in April 2021.

Skype calls with ACN and KRN from his psychiatric facility in England every day for an hour. He tried to read stories and play games with them, but often after a short period, ACN and KRN stopped paying attention to Nisbet on the screen.

Bridger never intended Scotland to be more than a temporary location for her and her children. In December 2021, Nisbet finally signed the necessary documentation for KRN's U.S. passport, knowing Bridger intended to take KRN to the United States. Bridger immediately applied for a U.S. passport for KRN. While waiting for months to receive KRN's U.S. passport, Bridger began packing and sent belongings to the United States. On June 17, 2022, Bridger left Scotland for the United States with ACN and KRN.

B.

On June 12, 2023, Nisbet petitioned under the Hague Convention that ACN and KRN be returned to Scotland, which he alleged was their habitual residence. Bridger responded and requested an expedited trial, which was granted. Judge Karin J. Immergut of the United States District Court for the District of Oregon presided over the expedited trial from October 16 through 18, 2023. Six days after the trial, on October 24, 2023, Judge Immergut denied Nisbet's petition, finding, *inter alia*, that Nisbet failed to prove by a preponderance of the evidence that Scotland was ACN and KRN's habitual residence. Nisbet timely appealed.

## II.

### A.

Under the Hague Convention, "a child wrongfully removed from her country of 'habitual residence' ordinarily must be returned to that country." *Monasky v. Taglieri*, 589 U.S. 68, 70–71 (2020). If a child does not habitually reside anywhere, the Hague Convention does not apply, and a petition for return thereunder should be denied. *See id.* at 82.

In general, a child's habitual residence is "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291–92 (3d Cir. 2006) (citation omitted) (cited with approval in *Monasky*, 589 U.S. at 77, 78). "This approach considers a child's experience in and contacts with her surroundings, focusing on whether she developed a certain routine and acquired a sense of environmental normalcy by forming meaningful connections with the people and places she encountered." *Id.* at 292 (cleaned up) (citation omitted); *see also Monasky*, 589 U.S. at 77 (noting the Hague Convention's explanatory report referred to a child's habitual residence as "the family and social environment in which [the child's] life has developed" (alteration in original) (citation omitted)).

"For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant." *Monasky*, 589 U.S. at 78. Such facts include "geography combined with the passage of an appreciable period of time," "age of the child," "immigration status of child and parent," "academic activities," "social engagements," "participation in sports

programs and excursions," "meaningful connections with the people and places," "language proficiency," and "location of personal belongings." *Id.* at 78 n.3 (citation omitted). "Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations." *Id.* at 78.

"No single fact, however, is dispositive across all cases." *Id.* Courts determine a child's habitual residence by looking at "the totality of the circumstances specific to [each] case," *id.* at 71, and they must be "sensitive to the unique circumstances of [each] case and informed by common sense," *id.* at 78 (citation omitted). "The bottom line: There are no categorical requirements for establishing a child's habitual residence." *Id.* at 80; *see also id.* at 78 (quoting *Karkkainen*, 445 F.3d at 291, for the proposition that the "inquiry into a child's habitual residence is a fact-intensive determination that cannot be reduced to a predetermined formula and necessarily varies with the circumstances of each case").

### B.

A habitual-residence determination is a mixed question of law and fact—"albeit barely so." *Id.* at 84. A trial court must first correctly identify the totality-of-the-circumstances standard. *Id.* Once it has done so, what remains is a factual question that can be reviewed on appeal only for clear error. *Id.* Under this standard of review, we cannot reverse a district court's finding that is "plausible in light of the record viewed in its entirety," even if we are convinced that we would have found differently. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). If "there are two permissible views of the evidence," the trial court's "choice

between them cannot be clearly erroneous." *Id.* (citations omitted).

This standard of review is deferential, so much so that the Supreme Court has adopted it in the Hague Convention context with the goal to "speed[] up appeals." *Monasky*, 589 U.S. at 84. Tellingly, we are not aware of any published opinion post-*Monasky*, including *Monasky* itself, that reversed a trial court's habitual-residence determination.[12]

### III

After a three-day trial, the district court found Nisbet failed to prove by a preponderance of the evidence that ACN and KRN habitually resided in Scotland when Bridger brought them to the United States. In making this finding, the district court took into account the following facts.[13]

### A.

When Bridger lived with ACN and KRN in Scotland from late 2019 through June 2022, ACN was approximately two to four years old, and KRN was less than two and a half years old.[14] Their ability to acclimatize to society was limited at the time. That said, the district court considered whether ACN and KRN could have acclimatized to Scotland

---

[12] This of course does not prevent us from reversing a district court's habitual-residence determination wherever required, just as the rarity of courts' finding no habitual residence does not stop us from affirming such a finding where, as here, required.

[13] The parties do not dispute that the district court correctly identified the governing *Monasky* standard.

[14] ACN also lived with Bridger in Scotland for approximately six months from August 2018 to February 2019, when he was less than one year old.

through three likely ties: people in the societal surroundings, Nisbet's family and friends, and Nisbet.

First, the district court found ACN and KRN did not make any friends at their nursery school or elsewhere in Scotland. Second, Nisbet's family severed contact with Nisbet, Bridger, and their children. Third, the district court considered ACN and KRN's lack of connection with Nisbet. Nisbet has been incarcerated since KRN's birth; he lived with ACN only intermittently for at most a year, half of which time he was bedbound because of his second suicide attempt. In fact, Nisbet himself has not lived in Scotland since 2017—he first lived in Jersey, then he was confined at Brockfield House in Essex, England and thereafter transferred to St. Andrew's Hospital in Northampton, England. Granted, Nisbet tried to interact with ACN and KRN over Skype from his psychiatric internment in England every day for an hour. Often after a short period, however, ACN and KRN stopped paying attention to Nisbet on the screen. All told, we see no clear error when the district court concluded ACN and KRN "had no family or friends in Scotland" and "no meaningful relationship with their father."

The dissent criticizes our consideration of whether ACN and KRN had a meaningful relationship with Nisbet. Dissent at 39–40. But *Monasky* teaches that one relevant factor of the acclimatization inquiry for determining children's habitual residence is whether they have built "meaningful connections with the people" there. 589 U.S. at 78 n.3 (citation omitted). It is not a clear error, therefore, for the district court to have considered this factor to conclude ACN and KRN did not habitually reside in Scotland. Moreover, the dissent also questions the district court's conclusion that ACN and KRN lacked a relationship

with Nisbet, given the handful of visits he had with the children and the Skype calls. Dissent at 39–40. But the inquiry is not whether the children interacted with Nisbet at all, but instead whether the relationship was meaningful. Here, the district court concluded—based on the entirety of the record, including Bridger's credible testimony—that it was not. That the dissent would come to a different conclusion on this issue does not make the district court's conclusion clearly erroneous.

The dissent further contends ACN and KRN had family in Scotland simply because they lived with each other and with Bridger. Dissent at 37–38. This is too clever by half. If the dissent were right, then a child abducted by a parent would, by definition, have a "family" in the country to which he is abducted. Such a logic that categorically favors the abductor parent, of course, cannot be condoned by the Hague Convention. Tellingly, even Nisbet's counsel had to concede at oral argument that the district court did not clearly err in finding ACN and KRN had "no family or friends in Scotland," a point that the dissent ignores.

## B.

Next, the district court followed the Supreme Court's teaching in *Monasky* that "the intentions and circumstances of caregiving parents are relevant considerations," when a child—like ACN, less than four and a half years old by June 2022, and KRN, less than two and a half years old at the time—is unable to acclimate due to his very young age or other reasons. *Monasky*, 589 U.S. at 78. On the mother's side, [15] Bridger's intention and circumstances militate

---

[15] Nisbet's counsel conceded at oral argument that the district court did not clearly err in finding Bridger to be ACN and KRN's caregiver.

against finding Scotland to be ACN and KRN's habitual residence because, as the district court observed, Bridger "had been shuttled through Jersey shelters," "repeatedly contemplated moving back to Oregon," and was in the United Kingdom "on an expiring visa."

The dissent reads the record differently, concluding Bridger's precarious British visa circumstance "strongly suggests that Bridger intended to remain in Scotland." Dissent at 39. To reach this conclusion, the dissent must disregard a plethora of Bridger's credible testimony that she never intended for Scotland to be more than a temporary location for herself and her children, and that she sought to renew her U.K. visa in 2021 only because she believed she needed additional time in the United Kingdom to obtain the necessary documentation from Nisbet for KRN's U.S. passport. That the dissent disbelieves Bridger's testimony does not necessarily mean the district court was mistaken in finding it credible, which finding Nisbet's counsel conceded at oral argument was not clearly erroneous.

The dissent then argues that, in any event, Bridger's visa status tells us nothing about ACN and KRN's habitual residence. Dissent at 39. Not so. Bridger's precarious British visa circumstance rendered it much less likely she intended Scotland to be ACN and KRN's habitual residence, and Bridger's "intention[]," "circumstance[]," and "immigration status" are all "relevant considerations" under *Monasky*, 589 U.S. at 78 & n.3 (citation omitted), especially when only Bridger was capable of being a caregiving parent for the very young ACN and KRN, since Nisbet was imprisoned.

Therefore, the district did not clearly err in placing significant weight on Bridger's lack of ties to Scotland when

ascertaining ACN and KRN's habitual residence.  *See Monasky*, 589 U.S. at 80 n.4 (recognizing the mother's integration to a country as a "highly relevant" factor, if a young child is "in fact looked after by her mother" (citing *Mercredi v. Chaffe*, 2010 E. C. R. I–14309, I–14379, ¶ 55)).[16]

On the father's side, the district court afforded little weight to his role as a caregiver.  The district court found Nisbet arguably "raised ACN in earnest" only "for the six months between February and August 2019," and he did not raise KRN at all because he had been imprisoned before KRN's birth.  Admittedly, Bridger depended on Nisbet's financial support throughout the relevant time, but that fact alone does not transform Nisbet into a caregiving parent. Caregiving means "[a] parent's or caregiver's task that either involves interaction with a child or directs others' interaction with a child."  *Caretaking Functions*, BLACK'S LAW DICTIONARY (12th ed. 2024).  It does not mean mere financial support.  Black's Law Dictionary also provides examples of caregiving functions, which include "feeding and bathing a child, guiding the child in language and motor-skills development, caring for a sick child, disciplining the child, being involved in the child's educational development, and giving the child moral instruction and

---

[16] In *Mercredi*, the Court of Justice of the European Union held that "[a]s a general rule, the environment of a young child is essentially a family environment, determined by the reference person(s) with whom the child lives, by whom the child is in fact looked after and taken care of." 2010 E. C. R. I–14309, I–14379, ¶ 54.

guidance." *Id.* Supplying financial wherewithal is not mentioned.[17]

Accordingly, we do not find the district court committed a clear error in focusing on the intention and circumstances of Bridger, the sole caregiving parent of ACN and KRN.

C.

Nisbet assails the district court's decision on three grounds. None of them suffices as a clear error.

First, Nisbet contends the district court clearly erred simply because it found ACN and KRN lacked habitual residence altogether.[18] This contention is tantamount to a categorical ban against finding no habitual residence. As the Supreme Court has made clear, the "bottom line" is "[t]here are no categorical requirements for establishing a child's habitual residence." *Monasky*, 589 U.S. at 80. While a finding of no habitual residence is rare and should be disfavored, it is not a clear error to render such a finding if the totality of the circumstances of a particular case so warrants. *See id.* at 81 (criticizing only "a presumption of

---

[17] *See also Caregiver*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A parent, foster parent, or social worker who looks after and exercises custodial responsibility for an infant or child."); *Custodial Responsibility*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("Physical child custody and supervision, usu. including overnight responsibility for the child.").

[18] Nisbet cites *Grano v. Martin*, an out-of-circuit district court case, for the proposition that courts have read *Monasky* to mean a finding of no habitual residence is inappropriate. 443 F. Supp. 3d 510, 535 (S.D.N.Y.), *aff'd*, 821 F. App'x 26 (2d Cir. 2020). But *Grano* does not lend Nisbet any help. All it suggested was that *Monasky* "has mostly undone the no-habitual-residence line of cases stemming from a lack of parental shared intent, at least for infants." *Id.* (emphasis added).

no habitual residence," not the finding of no habitual residence in individual cases); *id.* at 82 (faulting only a "categorical" requirement that "would leave many infants without a habitual residence"). We agree that a finding of no habitual residence should not be made lightly, but we do not see a clear error in finding no habitual residence in the unusual circumstances of this case.[19]

Second, Nisbet maintains the district court clearly erred in finding ACN and KRN had not habitually resided in Scotland, "where they had lived for two years and four months in the same apartment, where they had attended the same preschool, [and] where all of their medical and dental visits had occurred."[20] The Supreme Court has held a child's "mere physical presence" in a country "is not a dispositive indicator of" his habitual residence. *Monasky*, 589 U.S. at 81; *see also id.* at 78 (reasoning that a place is

---

[19] The dissent invites us to consider a counterfactual in which Nisbet fled his psychiatric facility and abducted ACN and KRN to Armenia. Dissent at 43–44. In that scenario, everything else being equal, we believe it would likewise not be a clear error for an Armenian court to find ACN and KRN lacked habitual residence in Scotland, if *Monasky* also governs in Armenia. There will always be children whom the Hague Convention is incapable of protecting—the dissent acknowledges as much. *See* Dissent at 45 (citing cases in which the dissent believes a finding of no habitual residence were appropriate).

[20] Nisbet also asserts ACN and KRN had friends in Scotland. This assertion, however, finds little support in the record. The only supporting evidence Nisbet cites is his own conclusory testimony: "They had friends there. They had nursery. They were very well-settled and actually had a good life there. They went to school there." In contrast, Bridger testified ACN and KRN "didn't actually make friends when they were in Scotland at nursery." They had acquaintances from elsewhere, but Bridger also testified "they never knew anyone on a name basis." Nisbet's counsel conceded at oral argument that the district court did not clearly err in crediting Bridger's testimony.

just "likely" to be a child's habitual residence, if the child has lived there "with her family <u>indefinitely</u>" (emphasis added)).   Nor is the attendance in any preschool determinative. [21]   *See id.* at 78 ("No single fact" "is dispositive across all cases.").   The ultimate object for evaluating a child's social engagement is to assess acclimatization. *Id.* at 78 & n.3.  Where, as here, factors such as physical presence and preschool attendance did not yield any meaningful social connections for a child, they are not entitled to much salience in courts' habitual-residence determinations.   Therefore, we see no clear error on the district court's part. [22]

---

[21] Nisbet cited several cases from other circuits for his proposition that a child's attendance at preschool is one of the most significant factors in determining the child's habitual residence.  While those cases might have regarded a child's attendance at school as one of the more pronounced factors in the circumstances of those cases, they do not suggest it to be a dispositive factor across all cases.  Additionally, we note that from 2020 to 2022, ACN (roughly two to four years old) and KRN (newborn to about two years old) were so young that, to them, the preschool was more akin to a daycare center rather than an academic school.

[22] Nisbet also faults the district court for considering Bridger's intention to leave Scotland and Nisbet's confinement.   He argues such consideration contravenes *Monasky*'s teaching that courts should focus on where a child—not either of his parents—is at home.  This argument fails because *Monasky* expressly licensed consideration of caregiving parents' intentions and circumstances, especially when the children are of such tender age as were ACN and KRN.  589 U.S. at 78.  The dissent contends a parent's intent "is most frequently relevant," when the parent's physical presence in a jurisdiction is relatively short, and when courts determine "whether there has been a *change* in the children's habitual residence."  Dissent at 35–36 (emphasis in original) (citing pre-*Monasky* cases).  The Supreme Court in *Monasky* did not so cabin the consideration of caregiving parents' intentions and circumstances.  Nor

Finally, Nisbet argues the district court clearly erred by resting its decision on Nisbet's alleged coercive behaviors toward Bridger. Not so. The district court made comments about Nisbet's coercive behaviors only after it had "resolve[d] this case in [Bridger's] favor." As such, these comments are dicta and cannot serve as a proper basis for reversal.[23]

### D.

The dissent argues a finding of habitual residence is "an inquiry into a single determinable fact," Dissent at 42 (citing *Kijowska v. Haines*, 463 F.3d 583, 587 (7th Cir. 2006), which predated *Monasky*), and must be "subject to de novo review," *id.* at 31 (praising *Silverman v. Silverman*, 338 F.3d 886, 896–97 (8th Cir. 2003), another pre-*Monasky* case, for offering "a clear-eyed view" of the proper standard of review for habitual-residence determinations). We decline the dissent's invitation to insubordination by regressing to a pre-*Monasky* world. *See Monasky*, 589 U.S. at 76 (explicitly abrogating the Ninth Circuit's holdings in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001), that placed greater weight on shared intentions of parents than on children's acclimatization, and that subjected district courts' habitual-residence determinations to de novo review).

---

does that factor's frequent relevance in certain contexts forecloses its consideration in others.

[23] It is also not a clear error for the district court to have mentioned these coercive behaviors. Whether a caregiving parent is coerced into living in a country is relevant to courts' habitual-residence determinations. *Monasky*, 589 U.S. at 78. Notably, Nisbet's counsel conceded at oral argument that the district court did not clearly err in crediting Bridger's testimony, which included testimony about Nisbet's coercive behaviors.

Disregarding the totality-of-the-circumstances standard set by the Supreme Court in *Monasky*, the dissent faults the district court for considering "noise" in the record such as ACN and KRN's lack of meaningful ties with Scotland, for such facts, in the dissent's view, answer not the question where the children habitually resided but where their best interests lay. Dissent at 24–25, 34–35. In the same vein, the dissent accuses the district court of "broaden[ing]" the factors that bear relevance on habitual-residence determinations. Dissent at 29–30, 45. The district court here, as discussed *supra*, firmly anchored its factual considerations to factors that the Supreme Court in *Monasky* expressly espoused as relevant to habitual-residence determinations. The dissent seems to select some factors to its liking but downgrade others, contrary to *Monasky*. *See* Dissent at 31–32.

Meanwhile, the dissent inserts itself into the trial courts' province by attempting to resurrect the de novo standard of review of *Mozes v. Mozes* for habitual-residence determinations. 239 F.3d at 1073. We agree with the dissent that a selection of facts in the record of this case can be read to support the conclusion that ACN and KRN habitually resided in Scotland, especially if one credits Nisbet's testimony over Bridger's. *See* Dissent at 32–34. That, however, does not mean the district court clearly erred in finding otherwise, especially when Nisbet's counsel conceded at oral argument that it was not a clear error for the district court to have credited Bridger's testimony. The clear-error standard of review, by definition, admits the possibility that more than one inference can be drawn from any given record; when that occurs, a trial court's choice between these permissible inferences cannot be clearly erroneous. *Anderson*, 470 U.S. at 574. In the end, the

habitual-residence determination "presents a task for factfinding courts"; appellate courts, once satisfied that the trial courts have considered the totality of the legally relevant factors, are not entitled to weigh these factors anew. *Monasky*, 589 U.S. at 84. The dissent's suggestion to bypass the district court flouts *Monasky*. *See* Dissent at 31–32.

As the dissent belittles *Monasky*, it brandishes the purpose of the Hague Convention, which aims to protect children from abduction. *See id.* at 44–45. But *Monasky* is no enemy to the Convention. The dissent may find the totality-of-the-circumstances test too "standardless," *id.* at 44, but the Supreme Court purposefully put "all the circumstances" "in play" so that "would-be abductors" would find it difficult to "manipulate the reality on the ground." *Monasky*, 589 U.S. at 82 (citation omitted). The dissent may find the clear-error review too inconvenient for its view to prevail, *see* Dissent at 31–32, but the Supreme Court laid down such a deferential standard of review to preserve "the Convention's premium on expedition" and to spare families from lengthy appeals. *Monasky*, 589 U.S. at 84 (citation omitted).

Defying *Monasky*, the dissent is perhaps out of its place. With respect, we cannot join the dissent's "protest" against the Supreme Court.**24** Dissent at 53.

## IV.

We owe obedience to the Supreme Court, which has encouraged trial courts to make habitual-residence determinations based on "a quick impression gained on a

---

[24] As we find the district court's decision faithfully followed *Monasky*, we see no reason to respond to the dissent's speculation regarding the district court's possible underlying motivation. *See* Dissent at 25–26.

panoramic view of the evidence." *Monasky*, 589 U.S. at 82 (citation omitted). Reviewing such determinations for clear error, we owe deference to trial courts, which enjoy the vantage point of observing witnesses' demeanor, candor, and other indicia of credibility.

In this case, as in many cases under the Hague Convention, reasonable minds can differ as to how evidence should be appraised. We must refrain from disturbing the district court's habitual-residence determination unless it clearly erred. Because we find it did not, we affirm.[25]

**AFFIRMED.**

---

BYBEE, Circuit Judge, dissenting:

The Hague Convention on the Civil Aspects of International Child Abduction is not an agreement as to the standards for determining questions of child custody that have spilled over international boundaries. Rather, like a forum selection clause, it is "a 'provisional' remedy that fixes the forum for custody proceedings." *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (citation omitted). The Hague Convention establishes the proper forum as of a particular place and time: "the State in which the child was habitually resident immediately before the removal." Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or "Convention"), Art. 3(a), Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, *reprinted at* 51 Fed. Reg. 10498 (March 26, 1986). The question in this case is whether the children of Spirit Bridger

---

[25] We express no view as to the district court's discussions of other issues.

and Dr. Andrew Nisbet had a habitual residence on June 17, 2022, the day Bridger took the children from Scotland to Oregon.

As of the day in question, Bridger had lived in Scotland (except for two brief periods when she lived on the Bailiwick of Jersey, a British Crown Dependency) for seven years, since 2015. Her children, ACN and KRN, were British citizens. ACN, about four and a half in June 2022, was born in Jersey, but had lived in Scotland with his mother since late 2018, except for part of 2019, when they returned to Jersey. KRN, about two and a half when she was abducted from Scotland, was born in Scotland and had never lived anywhere else. Scotland was their father's home, and they lived in an apartment he owned and paid for. The children attended nursery school in Scotland and received medical and dental care there. Only a year before she left, Bridger applied to the U.K. Home Office for her third long-term visa in anticipation of obtaining "settlement" in Scotland.

Notwithstanding the simplicity of these facts, the district court concluded that that the children did not habitually reside in Scotland on June 17, 2022. There is no alternative country of residence; they simply lacked "any habitual residence" at all. The majority agrees with the district court as to "Bridger's lack of ties to Scotland," which renders the children stateless for purposes of the Hague Convention, and therefore utterly without protection from parental abduction. Maj. Op. at 14–16.

That conclusion is beyond all reason. There is a lot of noise in this record.[1]  And the majority starts with the

---

[1] Bridger and Nisbet's relationship is long and complicated and, well before Nisbet killed his mother, not entirely conventional. Although, as

noisiest fact of all:  Nisbet killed his mother.  Maj. Op. at 4.
The majority continues with other noisy facts:  ACN and
KRN didn't have friends in nursery school in Scotland,
Nisbet's family has cut off contact with the children, and
Nisbet is a distant father.  Maj. Op. at 12–14.  The opinion
puts a bow on the exercise by observing that ACN and KRN
are now U.S. citizens and are well settled in Oregon, where
they have health and dental care and the support of extended
family.  Maj. Op. at 4 n.2.  From all of this, the majority
concludes that the district court committed "[no] clear error
in finding no habitual residence in the unusual circumstances
of this case."  Maj. Op. at 18.

The facts found by the district court and embraced by the
majority are, for the most part, not *clearly erroneous*.  But
they are *clearly irrelevant* to the only question we are
charged with answering:  Did the children have a habitual
residence on June 17, 2022?  The majority has utterly
confounded that inquiry because it has pursued, *sub silentio*,
a different question—the one the district court also
answered:  Where is it in the best interests of the children to
live now?  When that becomes the question, the answer
seems obvious—Oregon.  And once Oregon becomes the
place, our legal analysis follows logically:  If Oregon is the
best place for the children, they are better off in Oregon
courts, not Scottish courts.  And if the Scottish courts are not
the best place for resolving custody questions, then Scotland
cannot be the place of habitual residence.  Q.E.D.

---

I will explain, that history might be relevant to deciding questions of
custody, it is not relevant to deciding questions of residence.  I do not
entirely agree with the way the majority has laid out the facts, but rather
than complicate this opinion with irrelevant curiosities, I will supply
facts as necessary.

The answer to the correct question—where were the children habitually resident?—should have been quick and easy. The Supreme Court has held that we should take a "common sense" approach to the Hague Convention and said that "[c]ommon sense suggests that some cases will be straightforward:  Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Monasky*, 589 U.S., at 78. We took an easy question and made it hard. The majority, understandably and like the district court, takes a sympathetic view of the plight of the children, but in the end we have done what the Hague Convention abjures:  Instead of "allow[ing] the courts of the home country to decide what is in the child's best interests," we have decided for ourselves what is in the children's best interest and, not surprisingly, we "prefer [Oregon's] own society and culture" as a "friendlier forum" for resolving custody issues. *Abbott v. Abbott*, 560 U.S. 1, 20 (2010).

We are well out of our lane. I cannot follow my colleagues down that road. These children habitually resided in Scotland, the courts of Scotland are best situated to determine the custody and access rights of the parents, and we have to trust the Scottish courts to resolve these issues appropriately. Because I believe that we have violated our obligations under the Hague Convention, I firmly dissent.

## I

Adopted in 1980 in response "to the problem of international child abductions during domestic disputes," the Hague Convention "seeks to secure the prompt return of children wrongfully removed to or retained in any Contracting State and to ensure that rights of custody and of access under the law of one Contracting State are effectively

respected in the other Contracting States." *Abbott*, 560 U.S. at 8 (internal citation and quotation marks omitted). The Convention addresses this problem in two ways. First, it identifies the proper forum for resolving these disputes. Second, the Convention provides for the prompt return of the "wrongfully removed" child to that forum. The Convention identifies the proper forum as a particular place at a particular time: where the child "was habitually resident . . . immediately before any breach of custody or access rights." Hague Convention Art. 4. Under Article 3 of the Convention, "[t]he removal or the retention of a child is to be considered wrongful where . . . it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention." *Id.* Art. 3(a). The removal is wrongful whether the "rights [of custody] were actually exercised . . . or would have been so exercised but for the removal or retention." *Id.* Art. 3(b). When "[a]ny person" claims that a child has been wrongfully removed, she may apply to the State of the child's habitual residence or to any other Contracting State to secure the return of the child. *Id*. Art. 8. The International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*, implements the Hague Convention. Under ICARA, state and federal courts have concurrent jurisdiction over actions arising under the Convention. 22 U.S.C. § 9003(a); *see* 22 U.S.C. § 9003(b) (providing that "[a]ny person seeking to initiate judicial proceedings under the Convention for the return of a child" may file a petition in "any court which has jurisdiction of such action").

Once a party petitions under the Convention, "Contracting States shall act expeditiously in proceedings for the return of the children." Hague Convention Art. 11.

The right of return to the jurisdiction of the habitual residence is the principal remedy available under the Convention. When the proceedings are commenced within one year from the date of the wrongful return, the Contracting State where the child is present must "order the return of the child forthwith." *Id.* Art. 12. The Convention makes clear that any decision "concerning the return of the child shall not be taken to be a determination on the merits of any custody issue." *Id.* Art. 19; *see* 22 U.S.C. § 9001(b)(4) (providing that U.S. courts may "determine only rights under the Convention and not the merits of any underlying child custody claims"). The return remedy is a "provisional" one "that fixes the forum for custody proceedings." *Monasky*, 589 U.S. at 72. This is because the "Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." *Abbott*, 560 U.S. at 20. Under ICARA, the party seeking return must establish the child's "habitual residence" by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1)(A).

As relevant here, there is an exception to the right of return. A "State is not bound to order the return" if the party opposing return established that "there is a grave risk to his or her return [that] would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention Art. 13(b). ICARA provides that the party opposing return must establish the "grave risk" by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

The district court here concluded that Nisbet failed to carry his burden of proving by a preponderance of the evidence that ACN and KRN habitually resided in Scotland

prior to their mother removing them to Oregon. In the alternative, the district court concluded that Bridger showed by clear and convincing evidence that the children would be subject to grave risk if they were returned to Scotland. Because I conclude in Part II below that the district court's conclusion with respect to habitual residence is erroneous as a matter of both law and fact, I will address in Part III the district court's errors with respect to the grave risk.

## II

## A

Although "'[h]abitual residence' is the central—often outcome-determinative—concept" in Hague Convention cases, *Mozes v. Mozes*, 239 F.3d 1067, 1072 (9th Cir. 2001), neither the Convention nor ICARA defines the term. But there are basic principles. "A child 'resides' where she lives," and [h]er residence in a particular country can be deemed 'habitual,' . . . when her residence there is more than transitory." *Monasky,* 589 U.S. at 76 (citations omitted). The Court has explained that the Convention's explanatory report refers to "'the family and social environment in which [the child's] life has developed'" such that "[w]hat makes a child's residence 'habitual' is therefore 'some degree of integration by the child in a social and family environment.'" *Id.* at 77(citations omitted). According to the Court, "[t]he place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Id.* (quoting *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291 (3d Cir. 2006)). The Court has not identified any particular set of criteria for determining residence but has described the inquiry as depending on "common sense." *Id.* at 78.

The majority places great weight on *Monasky*'s charge that "[t]here are no categorical requirements for establishing

a child's habitual residence," and that the inquiry is a "fact-intensive determination . . . [that] necessarily varies with the circumstances of each case." *Monasky*, 589 U.S. at 78, 80. *See* Maj. Op. at 11; *see also id.* at 12 (noting that there is no case post-*Monasky* that reverses a trial court's habitual-residence determination). The lack of a fixed formula and a totality-of-the-circumstances inquiry does not free us from deciding what is and is not *legally* relevant. That there are "no categorical requirements" does not mean that anything goes. For example, a finding that one parent favors Real Madrid, while the other parent likes Manchester United may not be clear error, but it is legally irrelevant to determining one's residence. *Monasky* cannot be read so broadly. The Court said the habitual-residence inquiry was a mixed question of law and fact that "begins with a *legal* question: What is the appropriate standard for habitual residence?" *Monasky*, 589 U.S. at 84 (emphasis added).

A "totality-of-the-circumstances standard" is not an invitation to consider the totality of any circumstances the district court deems relevant. The majority, however, has taken *Monasky* as license for "anything goes." As the majority explains it, everything is on the table: You cannot "select some factors . . . but downgrade others[.]" *Id.* at 21. If every fact is potentially relevant and of equal value, it is hard to imagine what makes the majority think "[a] habitual-residence determination is a mixed question of law and fact." *Id.* at 11 (citing *Monasky*, 589 U.S. at 84). As Justice Scalia once colorfully observed, accepting a totality-of-the-circumstances test without knowing what is relevant may be "judge-liberating" but it is like taking the facts and "chuck[ing them] into a brown paper bag and shak[ing them] up to determine the answer." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128-29 (2008) (Scalia, J., dissenting); *see*

*Burnham v. Sup. Ct. of Cal.*, 495 U.S. 604, 626 (1990) (plurality op. of Scalia, J.) ("[D]espite the fact that he manages to work the word 'rule' into his formulation, Justice Brennan's approach does not establish a rule of law at all, but only a 'totality of the circumstances" test, guaranteeing what . . . rules of jurisdiction were designed precisely to avoid:  uncertainty and litigation . . . .").

In my view, the Eighth Circuit has offered a clear-eyed view of the proper role for our review, one perfectly consonant with *Monasky*:

> We recognize that a habitual residence determination must be based on facts and that the facts will vary considerably in each situation.  But a district court's determination of habitual residence is not devoid of legal principles. . . .  If habitual residence is treated as a purely factual matter, to be decided by an individual judge in individual circumstances unique to each case, parents will never be able to guess, let alone determine, whether they are at risk of losing custody by allowing their children to visit overseas or in allowing them to make international trips with an estranged spouse. . . .  [H]abitual residence [must] be a legal determination subject to de novo review . . . .

*Silverman v. Silverman*, 338 F.3d 886, 896–97 (8th Cir. 2003) (en banc).  Although the majority states that we are not to interfere with questions that are within the trial courts' province, it appears to acknowledge that whether the district court correctly applied the totality-of-the-circumstances test

is a question that is subject to more stringent review than review for clear error. Maj. Op. at 22 (noting that appellate courts must consider whether "trial courts have considered the totality of the *legally* relevant factors") (emphasis added). Embracing a totality-of-the-circumstances test does not mean that all facts are of equal weight. Some circumstances are more relevant than others. We abandon our responsibility to the law if are not discerning in the weight we give to the various facts.

In *Monasky*, the Court boiled the "appropriate standard for habitual residence" down to a single factual question: "Was the child at home in the particular country at issue?" *Monasky*, 589 U.S. at 84. It is to the facts supporting that inquiry that I now turn.

### B

This should have been a very simple case. As the Court observed in *Monasky*, if "a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence."[2] *Id.* at 78. ACN and KRN were young children when they were taken to the United States. As such we can reasonably look to the residence of their mother, who had been their primary custodial parent for their entire lives. *See id*. at 80 n.4; *Delvoye v. Lee*, 329 F.3d 330, 333 (3d Cir. 2003) ("'[I]n practice it is often not possible to make a distinction between the habitual residence of a child and that of its custodian. Where a child is very young it would, under ordinary circumstances, be very difficult for [her] to have the

---

[2] Puzzlingly, despite the majority's extensive—indeed, almost exclusive—reliance on *Monasky*, it dismisses this statement. Maj. Op. at 18–19 (stating that the Court "reason[ed] that a place is just 'likely' to be a child's habitual residence, if the child has lived there 'with her family indefinitely'") (emphasis omitted).

capability or intention to acquire a separate habitual residence.'" (quoting Paul Beaumont & Peter McEleavy, *The Hague Convention on the International Child Abduction* 91 (1999))). Bridger had a stable presence in Scotland. Except for two brief periods when she lived on the isle of Jersey with Nisbet's parents, Bridger had lived in Scotland since 2015. Not only had she resided there for some seven years, she had also resided in the same apartment in Edinburgh—one belonging to Nisbet—for her entire sojourn. From at least early 2020, she attended a weekly knitting club and had at least one friend there who she confided in. D. Ct. Op. at 12 & n.7. Bridger obtained a U.K. driver's license and drove after Nisbet's father put her on his car insurance. By any ordinary meaning of "habitual residence," Bridger habitually resided in Scotland on June 17, 2022, the day she took the children to Oregon. If, as Bridger's counsel stated at oral argument, "the children's home is with their mother," then ACN and KRN's home was in Scotland.

This case is equally easy if we focus exclusively on the children. ACN was born in Jersey and lived there briefly with both of his parents. When he was less than a year old, he moved to Scotland with his mother for six months, then moved back to Jersey, where he again lived with both of his parents at his grandparents' home until Nisbet was taken into custody. Shortly thereafter, ACN moved back to Scotland, where he lived with his mother (and, later, his younger sister) in the apartment owned by his father. Money to live on came from his father. By the time his mother took him to the United States when he was about four-and-a-half years old, he had lived in Scotland for most of his life and continuously since he was a year and a half old. He attended nursery school there, he received medical and dental care there, and

Bridger's family visited him there.  Scotland was clearly the location of "the family and social environment in which [ACN's] life ha[d] developed" until June 17, 2022.  *Mozes*, 239 F.3d at 1081 (citation omitted).

For KRN, this case is even simpler.  She was born in Scotland and lived there with her mother and older brother in her father's apartment and at her father's expense for her entire life, until the time her mother took her to the United States.   Except for a period of time during COVID lockdowns, she went to nursery school there.  She received medical care there.  Her mother's family from the United States visited KRN there.  She had personal belongings there that were important enough that her mother chose to delay leaving Scotland so that she could send those belongings to the United States.  Her two and a half years in Scotland, with all of the surrounding circumstances, easily suffice to establish that her presence in Scotland was "more than transitory."   *Monasky*, 589 U.S. at 76; *cf.* 28 U.S.C. § 1738A(b)(4) (defining "home State" for full faith and credit purposes in domestic custody cases as the place where the "the child lived with his parents . . . for at least six consecutive months").   A more complete picture of a "customary" or "usual" place where one "lives" is hard to imagine. *Id.*

## C

Notwithstanding the clarity of the facts and principles, the district court concluded that Nisbet failed to show by a preponderance of the evidence that ACN and KRN habitually resided in Scotland.  The court pointed to several facts:  (1) Bridger "repeatedly contemplated moving back to Oregon," (2) "[t]he children had no family or friends in Scotland," (3) Bridger was in the United Kingdom on an

expiring visa, (4) the children had "no meaningful relationship with their father," who lived in England, not Scotland, and (5) Nisbet "used his children as leverage to force [Bridger] to stay." D. Ct. Op. at 14–15; *see* Maj. Op. at 12–14. With respect to the question of where the children habitually resided, the first four of these findings are clearly erroneous, clearly irrelevant, or both. I will address each one.

(1) *Bridger's intent*. Bridger's intent to leave Scotland at some future time and return to Oregon did not prevent the children from becoming habitually resident in Scotland. *Norinder v. Fuentes*, 657 F.3d 526, 534 (7th Cir. 2011); *Mozes*, 239 F.3d at 1077 & n.26. Although "the intentions and circumstances of caregiving parents are relevant considerations," *Monasky*, 589 U.S. at 78, when "a child has no clearly established habitual residence elsewhere, [the child] may become habitually resident even in a place where [the child] was intended to live only for a limited time," *Mozes*, 239 F.3d at 1082. The Hague Convention deliberately chose the phrase "habitual residence," which is "not equivalent to the American legal concept of 'domicile,' which relies principally on intent." *Guzzo v. Cristofano*, 719 F.3d 100, 103 (2d Cir. 2013). Accordingly, "a family need not intend to remain in a given location indefinitely before establishing habitual residency there." *Watts v. Watts*, 935 F.3d 1138, 1144 (10th Cir. 2019).

The cases bear out that a parent's intent is most frequently relevant to determining habitual residence in two circumstances. First, it may be relevant when the parent's physical presence in the jurisdiction was relatively short. *See Kijowska v. Haines*, 463 F.3d 583, 587–88 (7th Cir.

2006); *Delvoye*, 329 F.3d at 332. [3] Second, parental intent may be relevant when we are determining whether there has been a *change* in the children's habitual residence. *See Pfeiffer v. Bachotet*, 913 F.3d 1018, 1024 (11th Cir. 2019) (per curiam) ("We have set forth two requirements to alter a child's habitual residence: (1) the parents must share a 'settled intention' to leave the old habitual residence behind; and (2) an 'actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized' must occur." (citation omitted)). So, if for example, we were trying to decide which of two countries was the habitual residence, we might consider the parents' intent. *See Silverman*, 338 F.3d at 898–99; *Mozes*, 239 F.3d at 1076–77; *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995). Outside of these circumstances, a parent's unilateral intent to return to another country—especially one that the child has never lived in—is not relevant to determining habitual residence. [4] Neither of these two circumstances

---

[3] Bridger's situation bears little resemblance to the facts of *Kijowska v. Haines*, which is the case relied on by the district court to conclude that Bridger's intent and immigration status were relevant to the children's habitual residence. D. Ct. Order at 14. In that case, the mother, a Polish citizen, had overstayed her student visa. Notwithstanding her immigration status, the mother gave birth in the United States to a daughter and two months later took her to Poland, where the child also had citizenship. The court held that the child had never established residence in the United States and that Poland was the child's habitual residence: "[I]t is impossible to reconcile [the father's] initial disavowal of custody over [the child], and [the mother's] expectation (based on her immigration status . . .) that she would be returning with [the child] to Poland, with [the child's] having acquired a habitual residence in the United States." 463 F.3d at 588.

[4] *See Norinder*, 657 F.3d at 534 (finding that the child's habitual residence was in Sweden even though he lived there for less than two years and his parents "thought that they might one day return to the

applies here. Bridger lived in Scotland for seven years, there has not been any change in ACN's residence since before KRN was born, and no change whatsoever in KRN's residence. There is no alternative habitual residence. In this case, the question of habitual residence is "Scotland or nothing."

(2) *Family and friends in Scotland.* The district court's finding that the children "had no family or friends" in Scotland is just plain error. Of course the children had

---

United States"); *Barzilay v. Barzilay*, 600 F.3d 912, 918–19 (8th Cir. 2010) (explaining that even though parents may not have intended to remain in the United States permanently, the children habitually resided in the United States because the children lived here "most or all of their young lives"); *Sorenson v. Sorenson*, 559 F.3d 871, 874 (8th Cir. 2009) (concluding that the child habitually resided in Australia after living there for three years); *Robert v. Tesson*, 507 F.3d 981, 996–97 (6th Cir. 2007) (determining that less than one year in the United States was enough to acquire habitual residence because the children enrolled in school, traveled to Yellowstone, and visited their grandmother); *Koch v. Koch*, 450 F.3d 703, 717–19 (7th Cir. 2005) (concluding that "the objective facts point[ed] unequivocally" to habitual residence in Germany, even though the parents intended to return to the United States at some point) (citation omitted); *Whiting v. Krassner*, 391 F.3d 540, 550 (3d Cir. 2004) (concluding that the child was habitually resident in Canada even though the parents agreed the stay would be "of a limited duration"); *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001) (finding that the children's habitual residence was Canada because they were born there and lived there "with their mother for a substantial portion of their lives"); *Feder*, 63 F.3d at 224 & n.13 (explaining that a four-year-old child's habitual residence was Australia after he lived there for six months and attended preschool there because the United States was the country of his "relatively distant past and [his mother's] unilaterally chosen future"); *Friedrich v. Friedrich* (*Friedrich I*), 983 F.2d 1396, 1402 (6th Cir. 1993) (concluding that the child habitually resided in Germany where he was born and lived until his mother took him to the United States).

family in Scotland.  The children lived with their mother. ACN lived with his sister, KRN; KRN lived with her brother. That the children had extended family living elsewhere doesn't change their habitual place of residence.

The majority misunderstands the point:  ACN and KRN had well-settled family in Scotland, and that makes the district court's finding that they had no family there clear error.  The majority claims this is "too clever by half" because "a child abducted by a parent would, by definition, have a 'family' in the country to which he is abducted."  Maj. Op. at 14.  From this the majority concludes that "such a logic that categorically favors the abductor parent, of course, cannot be condoned by the Hague Convention."  *Id.*  But this fundamentally misunderstands how the Hague Convention works.  Having family (especially immediate family that a child lives with) in Scotland is highly relevant to whether Scotland is the child's habitual residence; that a child has family (immediate or otherwise) in a far-off jurisdiction where the child has never resided has nothing to do with the child's habitual residence.  The majority has mistaken the merits of the underlying custody determination for the only question the Hague Convention answers:  Where is the proper forum for addressing the merits?

(3) *Bridger's visa status*.  The finding that Bridger was in Scotland on an expiring visa is irrelevant, at best.  Bridger testified that she originally obtained an entrepreneur visa for the U.K. so that she could open a coffee shop in Scotland, where she was living with Nisbet.  When that didn't materialize, she applied in 2018 for a domestic partnership visa, good for 30 months.  In 2021, she applied for a "settlement" visa, which would allow her to remain indefinitely.  The U.K. Home Office advised her that her application would be denied because she could not satisfy

the residency requirement by combining her time in Scotland under the two different visas. Told of this in April 2021, Bridger wrote the U.K. Home Office and changed her application to seek renewal of her 30-month partnership visa. The following day Nisbet wrote a letter in support of Bridger's application, advising the U.K. Home Office that she was his partner, that she and their two children were resident in his apartment, and asking that Bridger be granted "Indefinite Leave to Remain" in the U.K. in their "permanent home." The record does not indicate whether Bridger's partnership visa was renewed a second time, but the district court's finding that her visa was expiring—rather than expired—suggests that Bridger's 2021 renewal was successful. *See* Maj. Op. at 6 n.7, 8 n.10. All of this strongly suggests that Bridger intended to remain in Scotland. In any event, given her seven-year residency in Scotland, Bridger's immigration status tells us nothing relevant about where she or her children habitually resided before Bridger decided to return to the United States.

(4) *The children's relationship with their father*. The district court gave us precious few details, but when Bridger has been the primary caregiver, the quality of the children's relationship with their father, and whether their father lived in Scotland or England, has nothing to do with where the children habitually resided on June 17, 2022. *Compare Monasky*, 589 U.S. at 78 n.3 (discussing the relevance of "meaningful connections with the people and places in the child's *new* country"; emphasis added) *with id.* at 80 n.4 (stating that a "caregiving parent's ties to the country at issue are highly relevant"). Those questions might be relevant to a court deciding rights of custody and access, but not to the Convention's antecedent question of which court has the right to jurisdiction.

Even if relevant, the district court's findings on the children's lack of a relationship with their father are highly questionable.  Bridger took the children to see their father in England on at least four occasions between 2019 and 2021, spending several days during at least three of those visits with Nisbet.  When they visited in June 2021, for example, they spent four days with Nisbet.  They returned the following month for an additional four days.  In December 2021, Bridger took the children to see their father for two days.  Between visits, Nisbet spoke with his children by Skype almost every day.  During those calls, he read them stories and played games with them.  He also talked regularly with Bridger about the children and their care, and he gave Bridger $180,000 for herself and the children in case anything happened to him.  The majority seems to place great weight on the fact that, over time, the children took less interest in their father's calls.  Maj. Op. at 8–9, 13.  That the relationship was imperfect does not mean that they had "no meaningful relationship."  The district court offered no explanation for its finding.

(5) *Coercion*.  The one factor that the district court cited that might overcome Bridger's obvious residence in Scotland is whether Bridger was coerced into staying in Scotland.[5]  In *Monasky*, immediately after observing that "[w]here a child has lived in one place with her family . . . that place is likely to be her habitual residence," the Court offered a qualification:  A court should consider whether "an infant lived in a country only because a caregiving parent had been coerced into remaining there."  *Monasky*, 589 U.S. at 78.  The Court has provided little guidance on what

---

[5] Curiously, the majority dismisses the court's findings on coercion as "dicta [that] cannot serve as a proper basis for reversal."  Maj. Op. at 20.

qualifies as coercion, thereby nullifying a finding of habitual residence.  The district court's findings on Nisbet's "coercive behavior" are maddeningly thin.    Here is the complete discussion:

> [Nisbet] levied many demands on [Bridger] in exchange for his signature and money— including daily hours-long phone calls—and he threatened her, in ways that could also harm the children when she did not meet his demands.  On this evidence, [Nisbet] used his children as leverage to force [Bridger] to stay.

D. Ct. Op. at 15.  The court has provided no evidence as to how Nisbet was coercing Bridger into remaining in Scotland or how Nisbet could "harm" the children.[6]  Bridger had lived in Nisbet's apartment in Edinburgh since 2015, long before they had children.  At the time that she took the children to the United States, she was alone in the apartment because Nisbet was institutionalized.  Nevertheless, Bridger testified that she took the children to Nisbet's mental health institution in England multiple times to see their father.  The record contains family photos of Bridger, Nisbet, and ACN and KRN at Nisbet's facility.  Bridger scheduled daily video calls, up to an hour, so that Nisbet could talk with his children and read them stories.  D. Ct. Op. at 10.  Bridger applied to Scotland for a domestic partnership visa in 2018 and a renewal in 2021.  And then there is the money.  Bridger said that, after Nisbet was institutionalized, he gave her $180,000 to care for herself and the kids in case anything happened to him and because he didn't want all of his money

---

[6] Bridger bears the burden of proving coercion, because it is a defense to a finding of habitual residence.

to going to his mounting legal fees. This is not the stuff of
coercion. *See Mauvais v. Herisse*, 772 F.3d 6, 12–13 (1st
Cir. 2014) (finding no clear error in the district court's
conclusion that the mother was not coerced to remain in
Canada because she chose to stay in Canada even after she
moved out of the father's household). I do not see how the
record supports any inference that Bridger was restrained in
Scotland against her will. She may have been anxious to
leave Scotland, she may have worried about her visa status,
she may have been concerned that she could not lawfully
leave with the children, or she may have worried that she
was still needed as a witness in any criminal case against
Nisbet, but none of this suggests that Scotland was not and
had not been her—and the children's—regular residence.

## D

Two final observations are in order here. First,
determining the habitual residence of the children should be
a neutral inquiry. The Convention fixes the forum at a
particular place ("habitual residence") and time
("immediately before any breach of custody or access
rights."). It is not a balancing test, but an inquiry into a
single determinable fact. *See Kijowska,* 463 F.3d at 587
("'habitual residence' should bear a uniform meaning,
independent of any jurisdiction's notion of domicile"). The
Convention's forum-fixing inquiry is neutral in two senses:
The habitual residence of the children does not change
depending on what court is deciding the question, and the
habitual residence inquiry does not turn on whether the
mother, the father, or some other person absconded with the
children. Determining habitual residence should yield a
single answer. *See* 22 U.S.C. § 9001(b)(3)(B) (recognizing
"the need for uniform international interpretation of the
Convention").

Let's test the district court's analysis with a simple counterfactual. Let's suppose that Nisbet left the confines of his mental health institution and secreted ACN and RKN to a far-flung country, say Armenia. (Although we could use Brazil, Mauritius, Burkina Faso, Seychelles, or a hundred other countries which, like Armenia, are all signatories to the Convention.) That would have forced Bridger to "apply either to the Central Authority of the child's habitual residence or to the Central Authority of any other Contracting State for securing the return of the child." Hague Convention Art. 8. In this situation, Bridger has no argument that Oregon is the children's habitual residence. It is Scotland or nothing, which means that her choice of fora would be either Scotland, as the habitual residence of the children, or Armenia, where the children are physically present with their father. Is it plausible that the Armenian courts would deny return of the children because they "lacked a habitual residence altogether" because—despite the fact that their mother had lived in Scotland for seven years and the children were U.K. citizens and had lived in Scotland for most of their lives—the children had few friends in Scotland, they had no meaningful relationship with their father (who lived in England), and their mother's U.K. visa was about to expire? D. Ct. Order at 14–15. To state the problem in this way is to recognize how preposterous the court's conclusion is. The consequence of our hypothetical Armenian court's determination would be that Bridger would have to litigate her custody and access rights in Armenia, likely under Armenian law. It is obvious that in this hypothetical that Bridger would have every right to protest the unfairness of allowing Nisbet to choose a hostile foreign forum, and in these circumstances, she would surely claim that the children were habitually resident in

Scotland.  The majority's "Scotland for me, but not for thee" analysis cannot withstand scrutiny.[7]

Second, and relatedly, the majority's nearly standardless review will only encourage parents to choose their own forum.  Children who have no habitual residence are "outside the Convention's domain" and therefore unprotected from abduction.  *See Monasky*, 589 U.S. at 82. And the most vulnerable children, the ones most likely to have no habitual residence, are generally young infants. Infants and young children deserve our special consideration under the Convention because they are the least able to understand what is happening to them, and the least able to voice any opposition.  *See* Hague Convention Art. 13(b) (providing that a State may refuse to return a child "if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views"); *Monasky*, 589 U.S. at 80–81.  A judgment that children have no habitual residence effectively makes them stateless; they are not only subject to the whims of the parent who first abducts them, but they may be subject to competing efforts by their parents to find a favorable forum.[8]

_____

[7] The majority does not disagree with my counterfactual.  The majority comments that "[t]here will always be children whom the Hague Convention is incapable of protecting."  Maj. Op. at 18 n.19.  This is not reassuring.

[8] These concerns are far from theoretical.  In *In re A.L.C.*, 607 Fed. Appx. 658 (9th Cir. 2015), we held that the district court clearly erred when it concluded that E.R.S.C. was a habitual resident of Sweden, a country that she never lived in.  *Id.* at 662.  But we also agreed that the nine months E.R.S.C. lived in Los Angeles immediately following her birth did not make her a habitual resident of the United States, either.  *Id.* at 662–63.  Because E.R.S.C. had no habitual residence, she had not been

I agree with the majority's statement that "a finding of no habitual residence is rare and should be disfavored," nor should it "be made lightly[.]" I emphatically disagree that the "unusual circumstances of this case" warrant such a finding. Maj. Op. at 18. What the majority does here is *broaden* the relevant factors from which courts may conclude that a child has no habitual residence, and that makes it more likely that children will be successfully kidnaped by one parent in search of a friendly forum. Instead of limiting a finding of no habitual residence to young infants whose situation was genuinely transitory, *see*, *e.g.*, *Kijowska*, 463 F.3d at 587 (two months old); *Delvoye*, 329 F.3d at 333 (two months old), the majority now creates precedent that I fear will remove the Convention's protections for children in a wider range of circumstances.

These consequences are precisely what the Hague Convention was designed to avoid. The Convention provides a neutral rule for forum selection. Our judgment has undone the careful work of the Convention in this case.

---

wrongfully retained by her mother in the United States. *Id.* at 663. Nor was she wrongfully retained in Sweden by her father, after she was returned to Sweden because the district court—erroneously, as it turned out—determined that was her country of habitual residence and ordered her return. *Id.* E.R.S.C., a nine-month-old infant, was left without protection under the Hague Convention, and both parents were left without a remedy. The winning parent was whoever grabbed the child last. *See Taglieri v. Monasky*, 907 F.3d 404, 415 n.4 (6th Cir. 2018) (en banc) (Boggs, J., concurring) ("[A] finding of no habitual residence means that *either* parent, regardless of gender, is free to abduct the child . . . and the Hague Convention would have nothing to say about it."), *aff'd*, 589 U.S. 68 (2020).

## III

I now turn to the district court's alternative holding that, even if Scotland is the children's habitual residence, "there is a grave risk that [their] return would expose [them] to physical or psychological harm or otherwise place [them] in an intolerable situation." Hague Convention Art. 13(b).[9]

The Convention provides little guidance as to what counts as a grave risk to the physical or psychological harm of the child. The grave risk standard presents a particular dilemma, because unlike the inquiry into habitual residence, grave risk of harm may overlap with the "best interest of the child" standard that courts often use to judge the merits of battles over parental custody and access. And, as I have pointed out, both the Convention and ICARA make clear that their purpose is not to make any "determination on the merits of any custody issue." Hague Convention Art. 19; *see* 22 U.S.C. § 9003(b)(4); *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005) ("the exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest"; citation omitted). Acknowledging that a grave risk inquiry may overlap with the merits of a dispute, the courts have held that the grave-risk exception must "be interpreted narrowly, lest it swallow the rule." *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007). Thus, we have said that it only applies to prevent a child's return to the country of habitual residence in "extreme cases." *Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010). "The potential harm to the child must be severe, and the level of risk and danger required to trigger this exception has consistently been held to be very high."

---

[9] The majority does not reach this issue. Maj. Op. at 23 n.25.

*Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013) (cleaned up).

We have expressly narrowed the scope of the grave risk inquiry. In order to avoid opining on the fitness of the parents, we have made clear that

> the district court must be mindful that it is not deciding the ultimate question of custody, or even permanent return of the child to [the State of their habitual residence]. *That* decision will be made by the appropriate . . . tribunal [in the State of their habitual residence]. The district court must determine only whether returning the children . . . *for long enough for the . . . courts to make the custody determination will be physically or psychologically risky to them.*

*Mozes*, 239 F.3d at 1086 n.58 (second emphasis added). As we recently explained, "The question, then, 'is not whether the child would face a risk of grave harm should she *permanently* reside in [France], but rather whether she would face such a risk while courts in [France] make a custody determination.'" *In re ICJ*, 13 F.4th 753, 765 (9th Cir. 2021) (citation omitted); *see Gaudin*, 415 F.3d at 1037 ("[T]he grave-risk inquiry should be concerned only with the degree of harm that could occur . . . during the period necessary to obtain a custody determination."); *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995) ("The Article 13(b) inquiry . . . only requires an assessment of whether the child will face immediate and substantial risk of an intolerable situation . . . pending final determination of [the] custody dispute.").

Here, the district court concluded that there is a grave risk of harm to the children if they are returned to Scotland. The district court again made several supporting findings of fact:  (1) "sending the children alone to Scotland while [Nisbet] is confined is facially an intolerable situation," D. Ct. Order at 18; (2) Nisbet "meets the major risk factors for domestic violence," *id.* at 16; (3) Nisbet "has given inconsistent testimony to those meant to diagnose him," *id.* at 18; (4) Nisbet has shown "coercive, manipulable, violent, and threatening behavior" towards Bridger and their children, *id.* at 20; and (5) "the grave risk of displacing the children is starker still when juxtaposed with depriving the children of their mother and their support network in Oregon" because they have an "especially strong bond with their mother.  And in Oregon, the children have family, friends, and social benefits that, if returned to Scotland, they would lose in an extremely short time frame," *id.* at 20–21.

As with the district court's habitual residence findings, these findings, even if not clearly erroneous, are clearly irrelevant to the question whether the children were returned to Scotland "for long enough for the [Scottish] courts to make the custody determination." *Mozes*, 239 F.3d at 1086 n.58.  Whether considered individually or collectively, these findings do not establish by "clear and convincing evidence" that ACN and KRN would be subject to grave risk if returned to Scotland for custody proceedings.  Let's look at each finding.

(1) *"Facially intolerable."* The district court's finding that sending the children back to Scotland is "facially . . . intolerable" is a conclusion, not a finding of fact.  We have no standards for judging this as a finding of fact.

(2) *Risk for domestic violence*.  The finding that Nisbet shows "major risk for domestic violence" is pure speculation, based on a broad profile supplied by Dr. Poppleton, Bridger's expert, who repeatedly testified that he was discussing general risks to children and would not offer any opinions on whether Nisbet was a risk.  The district court's finding is not based on any historical evidence, because, as the district court acknowledged "there was no evidence that [Nisbet] physically abused [Bridger] or the children."  D. Ct. Order at 20.  In any event, it is not clear what this finding shows, because no one has suggested that Nisbet would have physical custody of the children during any court proceedings in Scotland.

(3) *Inconsistent information to medical providers*.  The court's finding that Nisbet gave inconsistent information to medical personnel treating him, without knowing the particulars, is apropos of nothing.  The district court's finding that Nisbet gave misleading information, especially in the absence of a finding of how it related to the risk of harm to the children if they are returned to Scotland for court proceedings, is irrelevant to the grave risk of harm.

(4) *Coercion*. The district court's finding on coercion has no more basis in the grave risk analysis that it did in the habitual residence inquiry—Nisbet is institutionalized in England, he was as attentive to Bridger and the children as his circumstances would permit, and he was financially supporting Bridger and the children in Scotland.  He willingly signed the papers for ACN and KRN to obtain American passports.  Where is the duress?  Where is the grave risk?  The district court had no answers beyond its bare assertion of coercion and manipulation.

(5) *The children's support network in Oregon.* Finally, the district court's finding that the children would lose their bonds with family and friends in Oregon, even if returned to Scotland for "an extremely short time frame," turns the Hague Convention on its head. It is not only a merits-based inquiry; it rewards Bridger for taking the children to Oregon and for every day that the proceedings in this case were extended. We have said, in no uncertain terms, that relying on this kind of evidence is "a very serious error. The fact that a child has grown accustomed to her new home is *never* a valid concern under the grave risk exception, as 'it is the *abduction* that causes the pangs of subsequent return.'" *Cuellar*, 596 F.3d at 511 (first emphasis added) (quoting *Friedrich v. Friedrich* (*Friedrich II*), 78 F.3d 1060, 1068 (6th Cir. 1996)). We have reminded district courts that the grave risk exception "is not license for a court in the abducted-to country to speculate on where the child would be happiest," but rather, "[o]nce the child is born, the remote parent must accept the country where the child is habitually resident and its legal system as given." *Id.* 509, 510 (quotation marks and citations omitted).

The real problem is that the district court began its grave risk analysis from the wrong premise. The court failed to follow our holdings on the proper scope of the grave risk inquiry—indeed, it showed no awareness of the limited inquiry we require—and instead asked a different question: What might happen to the children if Nisbet were given permanent custody? The district court was quite explicit in this. It announced that in assessing the grave risk it would consider "the probable consequences if [Nisbet] is released in the future." D. Ct. Order at 16; *see id.* at 25 (stating that "[a] return to Scotland would either leave the children unsupervised or under the supervision of their father").

There is nothing in the record that remotely suggests that Nisbet will be released any time soon, that Nisbet will get custody of the children, or that the Scottish courts are not capable of protecting the children during custody proceedings. And the district court knew this. *See* D. Ct. Order at 24 ("[I]t is unclear when or if the authorities in England and Jersey will relax [Nisbet's] restrictions. And . . . the Government of Scotland would need to independently permit [Nisbet] to enter the country even if he were permitted unescorted leave by other authorities."). The court's speculation was all based on its what-if-Nisbet-gets-full-custody inquiry.[10] That speculation is not a substitute for real proof, and the burden of showing grave risk by clear and convincing evidence was Bridger's.

The district court's concern with Nisbet getting custody is misplaced for a second reason. In the end, the district court simply decided the merits for itself: The district court concluded that it would be unthinkable that Nisbet could get custody over his children, that the children are better off with their mother, and that Oregon is a better place for the children to be raised. Yet, we have explained that "[t]he function of a court applying the Convention is not to determine whether a child is happy where it currently is, but whether one parent is seeking unilaterally to alter the status quo with regard to the primary locus of the child's life." *Mozes*, 239 F.3d at 1079 (footnote omitted); *see Gaudin*, 415 F.3d at 1035; *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001); *see also Silverman*, 338 F.3d at 901 ("[T]he district

---

[10] Many of these findings were based on the report of Bridger's expert witness, psychologist Landon Poppleton. But Dr. Poppleton made the same mistake as the district court—"that the children would be put at significant risk of harm *if returned to the UK to live under their father's care*."

court erred in taking into account the fact that [the children] are settled in their new environment."); *Nunez-Escudero*, 58 F.3d at 377 ("The district court incorrectly factored the possible separation of the child from his mother in assessing whether the return of the child to Mexico constitutes a grave risk . . . ."). For the district court, the grave risk was not about any physical harm that might come to the children during custody proceedings in Scotland, but the possibility that the Scottish courts would reach the wrong conclusion. To the district court that conclusion posed an "intolerable situation," *id.* at 25, and, accordingly, the courts of Scotland were not to be trusted with the decision in the first place. The court treated the grave risk inquiry as an opportunity to issue a pre-emptive appeal from any decision the Scottish courts might make.

## IV

We have made an egregious error here. There may be very good reasons for the Scottish courts to question whether Nisbet is a fit to be primary custodian of his children. He may or may not be a candidate to exercise continued custody over his children, including the right to have some say in where they are raised. If Scottish courts determine that Bridger is the proper custodial parent, she may plead for permission to remove the children to the Oregon, where she has the support of extended family. But these determinations must be made in the Scottish courts, not the courts of Oregon. Under any standard—indeed, beyond any reasonable doubt—the children were habitually resident in Scotland. The district court's failure to grasp that fundamental fact tainted the remainder of its opinion, which concluded that ACN and KRN are better off with their mother in Oregon than in Scotland, and that any other conclusion would pose a grave risk to their well-being. The

district court's conclusion is well-intentioned, but this was a straightforward inquiry. We have compounded the district court's error, making it more likely that children will be abducted by parents in search of a friendly forum in the Ninth Circuit.

I protest. Respectfully.